DYKEMA GOSSETT LLP
Jon D. Cantor (SBN: 91852)
*jdcantor@dykema.com*
Abirami Gnanadesigan (SBN: 263375)
*agnanadesigan@dykema.com*
333 South Grand Avenue
Suite 2100
Los Angeles, CA 90071
Telephone: (213) 457-1800
Facsimile: (213) 457-1850Suite 2100
Los Angeles, California 90071

Attorneys for Plaintiff
ITG BRANDS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ITG BRANDS, LLC, | Case No. 2:21-cv-00818-ODW-PVC |
| Plaintiffs, | Assigned to Hon. Otis D. Wright, II |
| vs. | **PLAINTIFF ITG BRANDS, LLC'S MOTION FOR PRELIMINARY INJUNCTION** |
| CAPNA INTELLECTUAL | |
| Defendant. | |
| | DATE:          May 24, 2021 |
| | TIME:          1:30 P.M. |
| | COURTROOM:    5D |

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................ 8

II.     RELEVANT FACTS ........................................................................... 9

        A.      ITGB ......................................................................................... 9

        B.      DEFENDANT'S INFRINGEMENT OF THE ICONIC
                INTERLOCKING "OO"s ....................................................... 12

III.    ARGUMENT ..................................................................................... 15

        A.      Preliminary Injunction Standard .......................................... 15

        B.      ITGB Is Likely to Succeed on the Merits of its Trademark
                Infringement Claim and Related Claims Because it Owns the
                KOOL Marks And There is A Likelihood of Confusion Between
                the KOOL Marks and Bloom Marks ...................................... 16

                1.      ITGB is the Owner of the KOOL Marks ................... 16

                2.      Likelihood of Confusion ............................................. 17

                        i.      Strength of the Mark .................................... 17

                        ii.     Similarity of the Marks ................................ 19

                        iii.    Proximity of the Goods Sold ........................ 20

                        iv.     Similarity in the Marketing Channels Used.......... 21

                        v.      Types of Goods and Degree of Care Likely to
                                be Exercised by Purchasers .......................... 22

                        vi.     Defendant's Intent in Selecting its Mark ............... 22

                        vii.    Likelihood of Expansion Into Other Markets ........ 23

        C.      Defendant is Likely to Dilute ITGB's Famous KOOL Marks ........... 24

                1.      The KOOL Marks Were Famous Prior to Defendant's
                        Wrongful Acts ............................................................ 24

                2.      Defendant Is Likely Blurring and Tarnishing the Strength
                        of the KOOL Marks .................................................... 26

        D.      ITGB is Likely to Suffer Irreparable Harm .......................... 28

        E.      ITGB's Motion for Preliminary Injunction Is Timely .......... 29

        F.      Final Requirements ............................................................... 30

                1.      The Balance of Equities Weighs in ITGB's Favor.......... 30

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

2

2. Public Interest ................................................................. 31

IV. ANY BOND SHOULD BE MINIMAL ............................................ 31

V. CONCLUSION .................................................................... 32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DYKEMA GOSSETT LLP**
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*,
   944 F.2d 1446 (9th Cir. 1991) ................................................................. 16, 27

*Airwair Int'l Ltd. v. Vans, Inc.*,
   No. 5:12-CV-05060-EJD, 2013 WL 3786309 (N.D. CA. July 17, 2013) ......... 27

*Alfred Dunhill of London, Inc. v. E. Martinoni Co.*
   161 U.S.P.Q. (BNA) 368 (Trademark Trial & App. Bd. February 27, 1969) ... 21

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .......................................................................... 15

*Am., Inc. v. Kmart Corp.*,
   No. CV-05-120-ST, 2006 U.S. Dist. LEXIS 49766, 2006 WL 2044857 (D. Or.
   June 15, 2006) .................................................................................................. 29

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ..................................................................*passim*

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
   480 U.S. 531 (1987) .......................................................................................... 30

*Apple Computer, Inc. v. Formula International, Inc.*,
   725 F.2d 521 (9th Cir. 1984) ............................................................................ 17

*BOSE Corp. v. OSC Audio Products, Inc.*,
   293 F.3d 1367 (Fed. Cir. 2002) ........................................................................ 25

*Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir. 1999) .......................................................................... 18

*Brooklyn Brewery Corporation v. Black Ops Brewing, Inc.*,
   156 F.Supp.3d 1173 (E.D. Cal. 2016) ............................................................... 29

*Century 21 Real Estate Corporation v. Sandlin*,
   846 F.2d 1175 (9th Cir. 1988) .......................................................................... 16

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

4

*Coach Servs. v. Triumph Learning LLC,*
   669 F.3d 1356, 101 USPQ2d 1713 (Fed. Cir. 2012)..........................................20

*Deere & Co. v. MTD Prods., Inc.,*
   41 F.3d 39 (2d Cir. 1994) ...............................................................................27

*Eclipse Associates Ltd. v. Data General Corp.,*
   894 F.2d 1114 (9th Cir. 1990) .........................................................................17

*Fiji Water Co. v. Fiji Mineral Water USA, LLC,*
   741 F.Supp.2d 1164 1177-78 ...........................................................................23

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.,*
   13 F.Supp.2d 417 (S.D.N.Y. 1998) ..................................................................29

*Go Daddy Operating Co., LLC v. Ghaznavi,*
   No. 17-cv-06545-PJH, 2018 U.S. Dist. LEXIS 33002
   (N.D. Cal. Feb. 28, 2018) ................................................................................31

*Groupion, LLC v. Groupon, Inc.,*
   859 F.Supp.2d 1067 (N.D. Cal. 2012)..............................................................21

*Hershey Co. v. Art Van Furniture, Inc.,*
   No. 08-14463, 2008 WL 4724756 (E.D. Mich. Oct, 24, 2008) ........................27

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,*
   4 F.3d 819 (9th Cir. 1993) ...............................................................................17

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.,*
   559 F.3d 985 (9th Cir. 2009) ...........................................................................15

*K-Swiss Inc. v. USA AISIQI Shoes Inc.,*
   291 F.Supp.2d 1116 (C.D. Cal. 2003)...............................................................23

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,*
   633 F.3d 1158 (9th Cir. 2011) .........................................................................26

*Levi Strauss & Co. v. Papikion Enters., Inc.,*
   No. C-10-05051 JSW, 2011 WL 3739550 (N.D. Cal. Aug. 24, 2011).............26

*Lorillard Tobacco Co. v. Cal. Imports, LLC*
   (E.D.Va. 2012) 886 F.Supp.2d 529 .................................................................27

*Marketquest Grp., Inc. v. BIC Corp.,*
   316 F.Supp.3d 1234 (S.D. Cal. 2018) ..............................................................19

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

5

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) ............................................................... 17

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) .................................................... 16, 18

*Nova Wines, Inc. v. Adler Fels Winery, LLC*,
    467 F.Supp.2d 965 (N.D. Cal. 2006) .................................................. 19

*Official Airline Guides, Inc, v Goss*,
    6 F.3d 1385 (9th Cir. 1993) ................................................................ 22

*R. J. Reynolds Tobacco Co. v. R. Seeling & Hille*,
    1978 TTAB LEXIS 152 (Trademark Trial & App. Bd. November 29, 1978) .. 21

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .......................................... 15, 16, 28, 30

*Rolley, Inc. v. Youngshusband*,
    204 F.2d 209 (9th Cir. 1953) .............................................................. 16

*Samick Music Corp. v. Gordon*,
    No. SACV 20-395-GW-JDEX (C.D. Cal. Mar. 26, 2020) ............................... 30

*Seed Services, Inc. v. Winsor Grain*,
    868 F.Supp.2d 998 (E.D. Cal. 2012) .................................................. 29

*Standard Brands, Inc. v. Smidler*,
    151 F.2d 34 (2d Cir. 1945) ................................................................. 20

*Stark v. Diageo Chateau & Estate Wines Co.*,
    907 F.Supp.2d 1042 (N.D. Cal. 2012) ........................................... 15, 31

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
    846 F.Supp.2d 1063 (N.D. Cal. 2012) .................................................. 28

*Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*
    (D.Or. Feb. 9, 2021, No. 3:21-cv-178-SI) 2021 U.S.Dist.LEXIS 24650 .......... 28

*Synoptek, LLC v. Synaptek Corp.*,
    No. SACV 16-01838-CJC(JCGx), 2018 U.S. Dist. LEXIS 116722 (C.D. Cal. June 4, 2018) ................................................................................. 29

*Teletech Customer Care Mgmt. (California), Inc. v. Tele-Tech Co.*,
    977 F. Supp. 1407 (C.D. Cal. 1997) ................................................... 25

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

6

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................... 15

*Zheng Cai v. Diamond Hong, Inc.*,
   901 F.3d 1367, 127 USPQ2d 1797 (Fed. Cir. 2018) ................................ 20

**Federal Statutes**

15 U.S.C. § 1057(b) .................................................................................... 16

15 U.S.C. § 1115(b) .................................................................................... 17

15 U.S.C. § 1116(a) .................................................................................... 28

15 U.S.C. § 1125(a) .................................................................................... 16

15 U.S.C. § 1125(c) .................................................................................... 16

15 U.S.C. § 1125(c)(1) ................................................................................ 24

15 U.S.C. § 1125(c)(2)(A) ........................................................................... 24

15 U.S.C. § 1125(c)(2)(B) ........................................................................... 26

15 U.S.C. § 1125(c)(2)(C) ........................................................................... 27

Controlled Substances Act (CSA) ............................................................... 12

**State Statutes**

Cal. Bus. & Prof. Code §17200 ................................................................... 16

**Rules**

Fed. R. Civ. P 65(c) .................................................................................... 31

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

## I.   **INTRODUCTION**

For more than 88 years ITG Brands, LLC ("ITGB") and its predecessors have worked to make KOOL a leading menthol cigarette brand. Since the inception of the KOOL brand, and as permitted by law, ITGB and its predecessors have used the KOOL marks on every aspect of the business, including packaging, point of sale materials, advertisements, direct mail, email, and websites, and collateral merchandise such as lighters, ashtrays, clothing, and music festivals. Central to the KOOL Marks are the iconic interlocking "OO"s – consistently used by ITGB and its predecessors in both the brand name and as standalone elements.

Capna Intellectual ("Defendant"), operating as Bloom Brands, in a blatant rip-off of ITGB's valuable trademarks, uses confusingly similar marks in connection with the sale of federally illegal and unregulated consumer packaged cannabis products. Alarmingly, Defendant's products have been subject to a California state wide recall due to pesticide contamination. Defendant also threatens to harm ITGB by expanding its product line to electronic cigarettes and other complementary products sold alongside KOOL cigarettes in retail outlets nationwide.

The similarity between the two companies' marks and the manner in which they use the marks on packaging and otherwise is obvious. Examples of ITGB's uses of the interlocking "OO"s are shown on the left below and examples of Defendant's uses are on the right:







Defendant's infringement is likely to confuse or mislead consumers as to the source of Defendant's products. Further, by associating the KOOL Marks with Defendant's unlawful, unregulated, and dangerous products, Defendant is likely to

8

1   dilute and tarnish the goodwill and reputation that ITGB and its predecessors have

2   built over decades in the KOOL brand. As such, a preliminary injunction should be

3   issued prohibiting Defendant primarily from: (1) promoting or selling products

4   bearing the infringing marks; (2) from expanding its product line using infringing

5   marks; and (3) placing its distributors and/or retailers on notice of the injunction and

6   prohibiting them from selling infringing product. An injunction would be the only

7   way for ITGB to avoid further irreparable harm.

8   **II.    RELEVANT FACTS**

9       **A.    ITGB**

10          ITGB is the third largest tobacco company in the United States and offers a

11  broad portfolio of some of the most famous and well-known cigarette, cigar and e-

12  vapor brands. This portfolio of iconic brands includes, *inter alia,* WINSTON and

13  SALEM cigarettes, DUTCH MASTERS cigars, BLU electronic cigarettes and

14  KOOL cigarettes.[1] ITGB is part of an industry that is heavily regulated on both the

15  state and federal level, and it is dedicated to conducting its business in a way that is

16  both responsible, and meets or exceeds the regulatory framework to which it is

17  subject. ITGB complies with all federal and state regulations concerning the

18  manufacturing and marketing of its products and is, beyond doubt, a trusted source.

19  KOOL was launched in 1933, and was the first menthol brand to gain nationwide

20  distribution. ITGB and its predecessors established and ITGB maintains a strong

21  reputation among adult smokers for quality and consistency. ITGB continually seeks

22  to ensure customer satisfaction and the integrity of its business. Graves Decl. ¶¶ 2-5.

23          KOOL is distinctive among menthol cigarettes, and the fusion of tobacco and

24  menthol is symbolized by the iconic interlocking "OO"s in the KOOL logo ⬤⬤

25

26  ———————————

[1]ITGB is a Texas Limited Liability Company and is a subsidiary of Imperial Brands plc, a British

27  multinational company headquartered in Bristol, United Kingdom. ITGB is the owner of all
relevant trademark rights associated with KOOL branded cigarettes.

28

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

and , which are present today in much the same form as on the original packaging and advertising. Examples of KOOL cigarettes' historical packaging and advertising, including their emphasis on the interlocking "OO"s (a central part of the KOOL Marks) within the KOOL logo and alone, are shown below:

Graves Decl. ¶¶ 6-7; Ex. 1.

ITGB inherited the KOOL package design from its predecessor, and has used the same package design continuously from 2015 through present. As depicted below, the interlocking "OO"s are used as part of the larger KOOL brand name, and are also used prominently on the side of all KOOL packaging (*Id.* ¶8; Ex. 2):

The interlocking "OO"s are also routinely used by ITGB as a standalone element. Below is one example from ITGB's email communications with customers:



Additional examples of ITGB and its predecessors' use of the interlocking "OO"s, including on point of sale materials and advertising through web, email, and

10

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

direct mail from 2015 (when ITGB acquired the KOOL brand and KOOL Marks) through the present are attached as Exhibits 2 and 3 to the Graves Declaration.

ITGB and its predecessors have invested substantial time, effort, and money in advertising and promoting cigarettes under the KOOL brand throughout the United States. From 2015, when ITGB acquired the KOOL brand, through the present, ITGB has spent significantly on advertising the KOOL brand. For fiscal years 2016 -2020, ITGB's advertising expenditures have averaged nearly 5.5 million dollars per year. Graves Decl. ¶ 10.

As a result of ITGB's excellent reputation and its investment in its brands, KOOL remains one of the world's most famous and valuable brands of menthol cigarettes; currently ranking fourth in the highly competitive United States market for adults smokers.  From 2015 through present, ITGB has sold over 1 *billion* packs of KOOL cigarettes. Sales steadily increased from 2015 and for fiscal years 2016-2020 have averaged more than 1 billion dollars per year, and are on pace to equal or exceed this dollar number this year. *Id.* at ¶ 12.

As depicted and discussed in paragraph 13 of the Graves Declaration, ITGB owns incontestable federal registrations on the Principal Register of the Trademark Office for the mark KOOL and for solid and outlined versions of the interlocking "OO"s. [2] The KOOL Marks are extremely valuable assets belonging exclusively to ITGB, and as a result of their having been used, advertised, and promoted by ITGB and its predecessors continuously for nearly 90 years, the KOOL Marks are well known and famous throughout the United States. For example, ITGB's internal market tracking shows that as of March 2020, 82.8 percent of adult tobacco consumers reported that they were aware of the KOOL brand.  *Id*. at ¶ 14. In fact, there is a robust secondary market for KOOL-branded merchandise and collectibles

---

[2]True and correct copies of the certificates of these registrations are attached to the Graves Declaration as Exhibit 4. These registrations remain in full force and effect and are conclusive evidence of the validity of the KOOL Marks, of ITGB's ownership of the KOOL Marks, and of ITGB's exclusive right to use the KOOL Marks throughout the United States.

1    that prominently display the interlocking "OO"s, further demonstrating the

2    relevance and fame of KOOL and the interlocking "OO"s trademarks.

3    Gnanadesigan Decl., Ex. 15.

**B.      DEFENDANT'S INFRINGEMENT OF THE ICONIC INTERLOCKING "OO"s**

6        Defendant, doing business as Bloom Brands since 2014, sells consumer

7    packaged cannabis goods under the marks **BLꝊM** and **Ꝏ** ("Bloom Marks").

8    Defendant's products sold under the Bloom Marks contain Tetrahydrocannabinol

9    (THC) and/or cannabidiol (CBD). Parts of the cannabis plant have been controlled

10   under the Controlled Substances Act (CSA) since 1970 and marijuana is listed in

11   Schedule I of the CSA due to its high potential for abuse. Defendant's consumer

12   products containing more than 0.03 percent of THC are currently illegal under

13   federal law, are not eligible for trademark registration, and are not regulated by the

14   FDA. Defendant has had issues controlling the quality of its products, as evidenced

15   by at least one incident in June 2018 when Defendant recalled a number of its

16   products containing THC because they contained harmful levels of the pesticide

17   Myclobutanil and did not comply with the California Bureau of Cannabis Control

18   (BCC) standards.

19       Defendant, through Application Serial No. 86900003 filed with the U.S.

20   Patent and Trademark Office on February 7, 2016, is also seeking registration of the

21   mark **BLꝊM** for, among other goods, "cartridges sold filled with chemical

22   flavorings in liquid form for electronic cigarettes" in class 34. The products covered

23   by this application are unrestricted in their channels of trade and customers to whom

24   they are sold, and are based on Defendant's claim that it has a bona fide intention to

25   use the mark **BLꝊM** in commerce for these goods. On September 12, 2019,

26   Defendant filed Application Serial Nos. 88614465 and 88614491 with the U.S.

27   Patent and Trademark Office seeking registration of the Bloom Marks for

28   "Electronic cigarettes and oral vaporizers for smokers for use with cannabis oil

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

extracts containing CBD derived from hemp containing no more than 0.3 percent THC (Delta-9 Tetrahydrocannabinol); Electronic cigarettes pre-filled with cannabis oil extracts containing CBD derived from hemp containing no more than 0.3 percent THC (Delta-9 Tetrahydrocannabinol); Cartridges pre-filled with cannabis oil extracts for use with electronic vaping devices containing CBD derived from hemp containing no more than 0.3 percent THC (Delta-9 Tetrahydrocannabinol)", in class 34. The products covered by these applications are also unrestricted in their channels of trade and customers to whom they are sold, and are also based on Defendant's bona fide intention to use the Bloom Marks in commerce for these goods. The aforementioned products are legal hemp products under federal law and therefore can be sold in the same retail outlets as KOOL cigarettes. Gnanadesigan Decl. ¶¶ 3-4, Exs. 6 and 7.

The Bloom Marks appear prominently on many of Defendant's products, advertising, and on Defendant's  website (http://www.thebloombrands.com). As shown below and attached as Exhibit 8 to the Declaration of Abirami Gnanadesigan, the Bloom Marks contain interlocking "OO"s which mimic the interlocking "OO"s in ITGB's famous KOOL Marks. Also as shown below, Defendant uses the Bloom Marks in black and red as well as in solid colors.





On December 3, 2020, after learning of Defendant's use of the infringing

Bloom Marks, ITGB sent Defendant a letter demanding it cease and desist the use of the Bloom Marks in connection with its promotion, advertising, distribution, import, sale, and/or offering for sale of its products.  ITGB demanded, among other things, that Defendant cease and desist any and all use of interlocking "OO"s, that it abandon Application Nos. 88614465 and 88614491, and that it refrain from filing any applications to register marks including the word KOOL or COOL and any other mark containing interlocking "OO"s in the future. *Id.* at 6; Ex. 5.

Defendant has not curtailed its use of the Bloom Marks, including the infringing interlocking "OO"s. On the contrary, Defendant appears intent upon continuing use of the Bloom Marks in relation to its sales of cannabis products. Indeed, three months after receipt of ITGB's cease and desist letter, and after the filing of this lawsuit, Defendant clearly demonstrated its willful disregard of ITGB's trademark rights by continuing to pursue its trademark applications using the "OO"s design element for products that directly compete with and will be sold alongside KOOL branded cigarettes.  Defendant is also "exploring opportunities to expand" and plans to launch sales of its infringing products in Arizona. *See* Gnanadesigan Decl., Ex. 10.

Notably, Defendant has marketed its Bloom products using at least one different non-infringing  logo in the past:



As such, if a preliminary injunction is issued by this Court, Defendant could continue selling its products under the Bloom brand by reverting to that logo or a different non-infringing logo.

Finally, Defendant's infringing conduct is not limited to the KOOL Marks. For example, Defendant's new flavor of its TREAT pre-rolls is called "Apple Jack" and as shown below, uses a logo that is a knockoff of Kellogg's Apple Jacks cereal.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION



Defendant also sells products that appear to have been "inspired" by Star Wars (e.g., referring to their "Skywalker" product as "A new kind of force" on Defendant's website) and the movie "Pineapple Express" starring actors James Franco and Seth Rogen (e.g., describing their "Pineapple Express" product as "now with more Franco and less Rogen"). Screenshots illustrating the advertisement of these products sold by Defendant are attached as Exhibit 19 to the Gnanadesigan Declaration. It is clear Defendant has a history of misappropriating third-party intellectual property and using it for Defendant's benefit.

## III.   ARGUMENT

### A.   Preliminary Injunction Standard

A preliminary injunction should issue where the plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *See Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Ninth Circuit has adopted a "sliding scale approach," such that "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "The essence of a trademark infringement is the likelihood of confusion, and an injunction should be fashioned to prevent just that." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009). "Preventing consumer confusion serves the public interest and there is a strong policy in favor of protecting rights to trademarks." *Stark v. Diageo*

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

*Chateau & Estate Wines Co.*, 907 F.Supp.2d 1042, 1067 (N.D. Cal. 2012). ITGB meets all elements necessary for a preliminary injunction.

### B.   ITGB Is Likely to Succeed on the Merits of its Trademark Infringement Claim and Related Claims Because it Owns the KOOL Marks And There is A Likelihood of Confusion Between the KOOL Marks and Bloom Marks

The first requirement for injunctive relief is a likelihood of success on the merits. *See Rodriguez*, 715 F.3d at 1133. To prevail on a claim of trademark infringement, a plaintiff must show (a) ownership of a valid mark and (b) use by defendant in commerce of a mark likely to cause consumer confusion. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011). Both prongs weigh in ITGB's favor.

ITGB's other trademark-related claims for false designation of origin/unfair competition under the Lanham Act (Count II) and unfair competition under Cal. Bus. & Prof. Code §17200 (Count IV) require essentially the same showing. 15 U.S.C. § 1125(a); 15 U.S.C. § 1125(c); Cal. Bus. & Prof. Code §§ 17200, *et seq.*, *Century 21 Real Estate Corporation v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988); *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991).

### 1.   ITGB is the Owner of the KOOL Marks

ITGB's certificates of trademark registration are prima facie evidence of: (1) the validity of the registered marks; (2) the registration of the marks; (3) the registrant's ownership of the marks; and (4) the registrant's exclusive right to use the registered marks in commerce on or in connection with the goods or services specified. 15 U.S.C. § 1057(b); *Rolley, Inc. v. Youngshusband*, 204 F.2d 209, 211 (9th Cir. 1953). As demonstrated by Exhibit 4 to the Graves Declaration, ITGB owns by assignment federal registrations on the Trademark Office's Principal Register of the mark KOOL and solid and outlined versions of the interlocking

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

"OO"s. These include Registration Nos. 508538, 747482, 2218589, 2578658, and 2617994 of the marks KOOL (stylized), KOOL (word mark) and KOOL (logo) and solid and outlined versions of the Interlocking "OO"s, each for cigarettes. These marks were registered decades ago and the registration certificates constitute conclusive evidence of ITGB's valid prior and incontestable rights in the KOOL Marks. 15 U.S.C. § 1115(b).

### 2.     Likelihood of Confusion

A likelihood of confusion exists "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 825 (9th Cir. 1993) (internal quotation marks omitted). Courts in the Ninth Circuit analyzing likelihood of confusion look to the eight factors identified in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003): (i) the strength of the mark; (ii) the similarity of the marks; (iii) the proximity of the goods sold; (iv) the similarity in the marketing channels used; (v) the type of the goods/services and the degree of care likely to be exercised by purchasers; (vi) the evidence of actual confusion; (vii) defendant's intent in selecting its mark; and (viii) the likelihood of expansion into other markets. All eight factors need not be considered when adjudicating a preliminary injunction motion. Instead, the Court may focus on the most relevant and probative factors. *See Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990) ("a non-exclusive series of factors"); *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) ("at this stage…, the trial court is not required to consider all of those factors."). Although not required, virtually all factors weigh in ITGB's favor.

### i.     Strength of the Mark

The KOOL Marks have an extraordinary high level of public recognition and

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

are strong. "The stronger a mark – meaning the more likely it is to be remembered and associated in the public mind with the mark's owner – the greater the protection it is accorded by the trademark laws." *Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1058 (9th Cir. 1999). Strong marks are inherently distinctive and are "afforded the widest ambit of protection" *Sleekcraft*, 599 F.2d at 349. Indeed, "[f]ederal trademark registration alone may be sufficient…to satisfy…distinctiveness." *Network Automation*, 639 F.3d at 1149 (internal quotation marks omitted). As established above, ITGB owns incontestable federal trademark registrations for the KOOL Marks.

The Court, however, need not rest on ITGB's incontestable federal registrations. The other relevant measurement for the strength of the mark is its commercial strength, and the KOOL Marks are also commercially strong in the context of ITGB's products. *Network Automation*, 639 F.3d at 1149. "Commercial strength is based on 'actual marketplace recognition,' and thus 'advertising expenditures can transform a suggestive mark into a strong mark." *Id.* (citing *Brookfield*, 174 F.3d at 1058). The KOOL Marks are some of the most well-known, famous trademarks in the tobacco industry; KOOL currently ranks fourth in terms of menthol cigarettes in the highly competitive United States market for adult smokers. ITGB owns strong rights in the KOOL Marks as a result of its and its predecessors' continuous and substantially exclusive use of the marks for nearly nine (9) decades. The commercial strength of the KOOL Marks is specifically demonstrated by the following: (1) ITGB and its predecessors have continuously and substantially exclusively promoted (as permitted by law) and sold cigarette products bearing the KOOL Marks, with an emphasis on the interlocking "OO"s for more than 88 years. (2) From 2015, when ITGB acquired the KOOL brand through present, ITGB has sold over 1 *billion* packs of KOOL cigarettes.  Graves Decl. ¶¶ 12-14. Each of these packs prominently displays ITGB's interlocking "OO"s in solid colors.  Sales steadily increased from 2015 and for fiscal years 2016-2020 have averaged more

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

18

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

than 1 billion dollars ($1,000,000,000) per year, and are on pace to equal or exceed this dollar number in 2021. *Id*. (3) ITGB has invested significantly in the promotion of the KOOL Marks –- for fiscal years 2016 through 2020, ITGB's advertising expenditures have averaged nearly 5.5 Million Dollars ($5,500,000) per year. *Id*. ¶ 10.

In sum, the KOOL Marks are strong, with the KOOL interlocking "OO"s being one of the most famous trademarks for cigarettes. The conceptual and commercially strong nature of the ITGB Marks weighs in favor of confusion.

### ii. Similarity of the Marks

The most "critical" factor is "similarity of the marks." *Marketquest Grp., Inc. v. BIC Corp.,* 316 F.Supp.3d 1234, 1270 (S.D. Cal. 2018); *Nova Wines, Inc. v. Adler Fels Winery, LLC*, 467 F.Supp.2d 965, 979 (N.D. Cal. 2006). As demonstrated below, the interlocking "OO"s that Defendant uses on its Bloom-branded products are often used in a nearly identical manner to the interlocking "OO"s in the KOOL Marks; including in substantially similar fonts and in capital letters: (1) as standalone elements in solid colors on the sides of product packaging; (2) as standalone elements in solid colors in other advertising and merchandising; (3) as standalone elements solid colors in communications with customers; and (4) prominently displayed within the brand names:



| ITGB'S USE OF KOOL MARKS | DEFENDANT'S USE OF BLOOM MARKS |
|---|---|

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

*See also* Graves Decl., Exs. 2-3; Gnanadesigan Decl. Ex. 8.

In opposition to this motion, ITGB anticipates that Defendant will rely upon certain color differences in the respective marks. However, any such argument would be a red-herring because in addition to its use of black-and-red Bloom Marks, as shown above, Defendant also uses interlocking "OO"s in black-and-white and other solid colors on its products, advertising, and merchandising. These marks are virtually identical to the interlocking "OO"s in ITGB's Registration Nos. 2578658 and 2617994 -- 🆗 and ⬤.  Moreover, even with regard to the black-and-red Bloom Marks, the overall commercial impression of the marks is what is relevant and the variations in color are not determinative. The test is not whether the marks can be distinguished in a side-by-side comparison, but rather whether their overall commercial impressions are so similar that confusion as to the source of the goods and services offered under the respective marks is likely to result. *See Zheng Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (citing *Coach Servs. v. Triumph Learning LLC*, 669 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012)). It cannot be disputed that Defendant has incorporated ITGB's iconic interlocking "OOs" to create its infringing marks. The addition of the color red in certain instances is not sufficient to distinguish the marks. This factor weighs in ITGB's favor.

### iii.    Proximity of the Goods Sold

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. "Related goods are those 'products which would be <u>reasonably thought</u> by the buying public to come from the same source if sold under the same mark." *Id.* at 348 n. 10 (quoting *Standard Brands, Inc. v. Smidler*, 151 F.2d 34, 37 (2d Cir. 1945)) (emphasis added). "To determine whether goods are related, courts may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

whether the goods are similar in use and function." *Groupion, LLC v. Groupon, Inc.*, 859 F.Supp.2d 1067, 1074 (N.D. Cal. 2012).[3] Based on the numerous and well-known investments large tobacco companies have been making in cannabis companies, it would certainly be reasonable for a purchaser of Defendant's product to believe the source of that product to be ITGB. Indeed, in June 2018, Imperial Brands (of which ITGB is a subsidiary) invested in a biotech company researching medicinal cannabis to give it "a deeper understanding of the medical cannabis market."

Finally, even if cannabis was not in ITGB's zone of natural expansion, ITGB and its predecessors have used the interlocking "OO"s on lawful cigarette products for more than eighty-eight (88) years. As the senior user of these marks, ITGB is entitled to enjoin junior users like Defendant from offering goods under marks that consumers are likely to associate with, and would expect to originate from, ITGB – irrespective of whether ITGB presently sells those goods or not.

### iv.    Similarity in the Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 35. Defendant's products are offered, or will be offered, through channels that overlap with those of ITGB. Electronic cigarettes and/or oral vaporizors containing CBD derived from hemp – the very products that are the subject of Defendant's Intent to Use Applications - are routinely sold side by side ITGB's KOOL cigarettes at convenience stores. *See* Gnanadesigan Decl. ¶¶ 13-14, Exs. 16-17. Any argument Defendant may make that its goods can only be sold

---

[3]ITGB anticipates that Defendant will rely on the fact that its products do not contain tobacco in its opposition. However, this factor is not determinative in the likelihood of confusion analysis. *See Alfred Dunhill of London, Inc. v. E. Martinoni Co.,* Opposition No. 46,446, 161 U.S.P.Q. 368, (T.T.A.B. 1969) (refusing registration and finding applicant's use of the mark DUNHILL for whisky and gin would be confusingly similar to opposer's registration for the mark DUNHILL for cigars*); R. J. Reynolds Tobacco Company v. R. Seelig & Hille*, Opposition No. 57,640, 201 U.S.P.Q. 856, (T.T.A.B. 1978) (refusing registration and finding applicant's use of a logo mark with the words SIR WINSTON for tea and related accessories would be confusingly similar to opposer's registration for the mark WINSTON for cigarettes).

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION

through state-licensed cannabis dispensaries which do not permit the sale of ITGB's KOOL cigarettes is another distinction without a legal difference. On August 18, 2020, the US Trademark Office refused Defendant's application to register the mark BLOOM for "nutraceuticals and dietary supplements containing cbd derived from hemp containing no more than 0.3 percent THC (delta-9 tetrahydrocannabinol)" both on the grounds a) the product was illegal under Federal law; and b) the mark was confusingly similar to the identical mark for, *inter alia*, "chocolate-based meal replacement bars." That fact that Applicant's goods may have been illegal under Federal law, and therefore only sold through state-licensed dispensaries, had no bearing on the Trademark Office' conclusion the goods were commercially related. *See* Gnanadesigan Decl., Ex. 18. As such, this factor weighs in ITGB's favor.

### v.    Types of Goods and Degree of Care Likely to be Exercised by Purchasers

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. "When the buyer has an expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." *Id.* "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." *Id.* Here, the products at issue are relatively inexpensive, which would suggest that purchasers would not exercise a high degree of care. *See id.* For example, Defendant's TREAT pre-roll product that has the interlocking "OO"s on the product packaging retails for $9.00. (https://shop.thebloombrands.com). The average price for a pack of KOOL cigarettes is $6.66.

### vi.    Defendant's Intent in Selecting its Mark

"When the alleged infringer knowingly adopts a mark similar to another's reviewing courts presume that the defendant can accomplish this purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354; *see also Official*

22

*Airline Guides, Inc, v Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). There is no doubt that Defendant was aware of ITGB when they created their Bloom Marks as the strong resemblance between the interlocking "OO"s cannot have arisen by coincidence. *See K-Swiss Inc. v. USA AISIQI Shoes Inc.,* 291 F.Supp.2d 1116, 1124 (C.D. Cal. 2003) (close resemblance "indicates an intent to deceive the public"); *see also Fiji Water Co. v. Fiji Mineral Water USA, LLC*, 741 F.Supp.2d 1164 1177-78; 1181(C.D. Cal. 2010) ("obvious similarity between the two bottles permits an inference of intent"). Defendant's wrongful intent in selecting the interlocking "OO"s is further demonstrated by its repeated infringement of other iconic brands. *See* Section II. B. above. This factor also weighs in ITGB's favor.

### vii.   Likelihood of Expansion Into Other Markets

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. "When goods are closely related, any expansion is likely to result in direct competition." *Id.* Here, as discussed above, based on its bona fide intent to expand its product line, Defendant is seeking registration of the Bloom Marks for: (1) cartridges used for electronic cigarettes; and (2) electronic cigarettes, oral vaporizers, and other devices for use with cannabis oil extracts containing CBD derived from hemp. These are legal products under federal law, and are sold in the same retail outlets, and side-by-side KOOL cigarettes. Defendant has also publicly advertised its imminent plans for expansion to other geographical markets and that its products are "coming soon" to Arizona.

In sum, Defendant's acts are likely to confuse consumers about the origin of its Bloom brand products. *Sleekcraft*, 599 F.2d at 348 (where goods are directly competitive, infringement will be found if marks are sufficiently similar). Given the high risk of confusion present here, ITGB is likely to succeed on the merits of its trademark infringement and related claims.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

### C.    Defendant is Likely to Dilute ITGB's Famous KOOL Marks

Even if there was no evidence of likelihood of confusion, which is not the case, a preliminary injunction is still appropriate because ITGB is likely to succeed on the merits of its dilution claim. The owner of a famous mark is "entitled to an injunction against another person who, at <u>any time after the owner's mark has become famous</u>, commences use of a mark…in commerce <u>that is likely to cause</u> dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1) (emphasis added).

### 1.    The KOOL Marks Were Famous Prior to Defendant's Wrongful Acts

ITGB's KOOL Marks, including the iconic interlocking "OO"s are famous, and they achieved fame long before Defendant launched its Bloom-branded products. In fact, the KOOL Marks are some of the strongest marks in the menthol cigarette market ever. The Lanham Act identifies factors to consider in determining whether a mark is famous for purposes of dilution: (i) duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties, (ii) amount, volume, and geographic extent of sales of goods or services offered under the mark, (iii) extent of actual recognition of the mark, and (iv) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A). These factors demonstrate that the KOOL Marks are famous marks.

First, ITGB and its predecessors have continuously used the KOOL Marks since 1933. KOOL's packaging materials, both historically and currently, bear the KOOL Marks, including the iconic interlocking "OO"s. The interlocking "OO"s not only appear within the brand name KOOL; they also consistently appear as standalone elements in the KOOL packaging, printed vertically along the right-hand side of each pack. The KOOL Marks are displayed on the KOOL website at

24

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

kool.com, at thousands of authorized retail outlets, on permitted marketing and advertising materials to adult consumers, on direct mail and email communication with adult consumers, and even as an important component of the popular KOOL jazz festival established in 1954. Over the years, the KOOL Marks have been used on a wide variety of collateral products such as ashtrays and lighters, neon signs, t-shirts, and countess other promotional items. Since the brand's inception almost 90 years ago, and as permitted, ITGB and its predecessors have invested a substantial sum to advertise and promote the KOOL products to adult smokers.  For fiscal years 2016-2020, ITGB's advertising expenditures alone have averaged nearly 5.5 million dollars ($5,500,000) per year.  Graves Decl. ¶ 10.

Second, the commercial successes embodied in the KOOL Marks far exceeds levels for other marks that courts have held to be famous. *See e.g., Teletech Customer Care Mgmt. (California), Inc. v. Tele-Tech Co.,* 977 F. Supp. 1407, 1413 (C.D. Cal. 1997) (crediting "hundreds of millions of dollars' worth of services under the TELETECH Service Mark"); *BOSE Corp. v. OSC Audio Products, Inc.,* 293 F.3d 1367, 1371-73 (Fed. Cir. 2002) ("The [WAVE] product has enjoyed vast commercial success, with current annual sales of $100 million…and sales since inception of $250 million."). From 2015 when ITGB acquired the KOOL brand through present, ITGB has sold over 1 *billion* packs of KOOL cigarettes. Sales steadily increased from 2015 and for fiscal years 2016-2020 have averaged more than 1 billion dollars ($1,000,000,000) per year, and are on pace to equal or exceed this dollar number this year. Such significant numbers hardly constitute the "dying business" Defendant referred to in its now moot Motion to Dismiss (Dkt. No. 16). The relevance and recognition of  the KOOL brand in today's pop culture is further demonstrated by celebrities who are captured wearing t-shirts displaying the KOOL brand. *See* Gnanadesigan Decl., Ex. 12.

Third, the adult consuming public, and the public at large, widely recognize the KOOL brand. ITGB's internal reporting as of March 2020 show that 82.8

percent of adult tobacco consumers are aware of the KOOL brand.  Graves Decl. ¶ 14. Indeed, The KOOL logo and the iconic interlocking "OO"s are central to the KOOL brand and appear on virtually every aspect of the product, its merchandising, and advertising. In 2015, the United States District Court for the Middle District of North Carolina found that "[a]s a result of more than eight decades of continuous use and promotion of the KOOL Marks, [the] KOOL Marks have acquired a high degree of recognition, and distinctiveness throughout the United States as symbols of quality tobacco products. The public is uniquely aware of the KOOL Marks and identifies those marks with [ITGB's predecessor]."  *See* Gnanadesigan Decl., Ex. 13 at 6-7.

Fourth, the federal registrations of the KOOL Marks issued in 1949, 1963, 1999, and 2002. These registrations are incontestable.

All of the above factors weigh in favor of a finding that the KOOL Marks are famous and they were famous long before Defendant's adoption of the interlocking "OOs" in their Bloom Marks in or about 2014.

## 2. Defendant Is Likely Blurring and Tarnishing the Strength of the KOOL Marks

Dilution by blurring occurs when an "association from the similarity between a mark or trade name and a famous mark…impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B); *Levi Strauss & Co. v. Papikion Enters., Inc.,* No. C-10-05051 JSW, 2011 WL 3739550, at *9 (N.D. Cal. Aug. 24, 2011). ITGB need not establish that the Bloom Marks are identical, nearly identical, or even substantially similar to its KOOL marks in order to obtain injunctive relief. *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158, 1172 (9th Cir. 2011). The Lanham Act provides six non-exclusive factors a court may consider when determining whether a mark is likely to be diluted by blurring: (i) the degree of similarity between the mark or trade name and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark or trade name intended to create an association with the famous mark; and (vi) any actual association between the mark or trade name and the famous mark. *Id.* Many of these elements (similarity of the marks, degree of distinctiveness in terms of consumer recognition, and intent)  are discussed above in the likelihood of confusion analysis, and the same arguments apply to establish tarnishment by blurring. *See Airwair Int'l Ltd. v. Vans, Inc.*, No. 5:12-CV-05060-EJD, 2013 WL 3786309, at *7 n.1 (N.D. CA. July 17, 2013) (applying likelihood of confusion analysis to assess dilution by blurring). The remaining two factors weigh in favor of a finding of tarnishment by blurring. First, ITGB is the only company that uses the interlocking "OO"s, or any similar marks, in connection with tobacco or related products. Second, actual association is not necessary to prevail on a dilution claim. *See Hershey Co. v. Art Van Furniture, Inc.,* No. 08-14463, 2008 WL 4724756, at *15 (E.D. Mich. Oct, 24, 2008).

Dilution by tarnishment occurs when "association arising from the similarity between a mark or trade name and a famous mark…harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Tarnishment occurs when another's use of a mark is associated with unwholesome activity. *See Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994) ("'Tarnishment' generally arises when the plaintiff's trademark is linked to [services] of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's [services.") (citing *Acad. of Motion Picture Arts & Scic. v. Creative House Promotion, Inc.,* 944 F.2d 1446, 1457 (9th Cir. 1991)). Here, tarnishment of the KOOL Marks is likely because ITGB will suffer a negative association with the federally illegal, unregulated, and dangerous products of Defendant that have been subject to a recall as discussed above. *See e.g. Lorillard Tobacco Co. v. California Imports, LLC*, 886 F.Supp.2d 529 (E.D Va. 2012) (use of plaintiff's tobacco mark

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

on a "spice" smoking product containing synthetic marijuana constituted dilution by tarnishment).

In sum, all of these factors weigh in ITGB's favor. Indeed, the interlocking "OO"s used by Defendant on its Bloom-branded products are virtually identical to the interlocking "OO"s in KOOL-branded products and there is concrete evidence that Defendant's use of the marks is likely to impair the distinctiveness of the famous KOOL Marks. As such, ITGB is likely to succeed on the merits of its dilution claim.

### D. ITGB is Likely to Suffer Irreparable Harm

The second requirement for injunctive relief is that the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief. *See Rodriguez*, 715 F.3d at 1133. Here, ITGB is entitled to a presumption of irreparable harm because it is likely to succeed on the merits of its infringement and dilution cases. *See Suzie's Brewery Co. v. Anheuser Busch Cos.,* No. 3:21-cv-178-SI, ECF No. 31, D. Or. Feb. 9, 2021; *see also* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.").

Notwithstanding the presumption of irreparable harm, ITGB likely to suffer irreparable harm because Defendant's continued infringement will irrevocably harm ITGB's reputation amongst adult consumers. The "Ninth Circuit has recognized the potential loss of good will or the loss of the ability to control one's reputation may constitute irreparable harm for purposes of a preliminary injunctive relief." *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F.Supp.2d 1063, 1083 (N.D. Cal. 2012). ITGB maintains strict quality control measures over the products bearing the KOOL Marks, and as a result, KOOL has a worldwide reputation for

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

28

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

quality and authenticity. Defendant's continued use of the infringing Bloom Marks to promote and sell its products that have been subject to a mass recall, and that admittedly contain toxic pesticide effectively saddles ITGB's carefully curated reputation and goodwill with Defendant's dangerous and unregulated products. ITGB stands to lose significant credibility as consumers may be confused that Defendant's products are associated with or approved by ITGB.

Thus, absent a preliminary injunction, Defendant will continue to sell its products further flooding the market with its products of unknown quality – all causing irreparable harm to ITGB's reputation and the goodwill built in the KOOL Marks over many decades. This favors granting a preliminary injunction. *See e.g., Seed Services, Inc. v. Winsor Grain*, 868 F.Supp.2d 998, 1005 (E.D. Cal. 2012) (finding irreparable harm where if defendants' actions were to continue unabated, plaintiff would "have lost control over its business reputation."); *Brooklyn Brewery Corporation v. Black Ops Brewing, Inc.,* 156 F.Supp.3d 1173, 1185 (E.D. Cal. 2016).

### E.     ITGB's Motion for Preliminary Injunction Is Timely

There are no "rigid deadlines" by which a request for preliminary injunctive relief must be made. *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 13 F.Supp.2d 417, 419 (S.D.N.Y. 1998). Here, there was no delay. As demonstrated by its successes in other infringement actions related to the KOOL marks, ITGB is diligent in enforcing its trademark rights. *See* Gnanadesigan Decl., Ex. 14. ITGB first learned of Defendant's applications to register and use of the infringing Bloom Marks on or about October 9, 2020. Graves Decl. ¶ 16. Any prior use of the BLOOM Marks by Defendant was not sufficient to place ITGB on notice because any such use was federally prohibited. *See Synoptek, LLC v. Synaptek Corp*., No. SACV 16-01838-CJC(JCGx), 2018 U.S. Dist. LEXIS 116722, at *19 (C.D. Cal. June 4, 2018) (citing *adidas Am., Inc. v. Kmart Corp*., No. CV-05-120-ST, 2006 U.S. Dist. LEXIS 49766, 2006 WL 2044857, at *8 (D. Or. June 15, 2006)) ("a trademark owner is 'not

required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon spotting a possible infringer.").

## F.    Final Requirements

The third and fourth requirements for injunctive relief are that the balance of equities tips in the ITGB's favor, and that an injunction is in the public interest. *See Rodriguez*, 715 F.3d at 1133.

### 1.    The Balance of Equities Weighs in ITGB's Favor

The balance of equities tip sharply in favor of granting preliminary injunctive relief. "A court considering injunctive relief must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Samick Music Corp. v. Gordon,* No. SACV 20-395-GW-JDEX (C.D. Cal. Mar. 26, 2020) (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)). Without injunctive relief, ITGB's longstanding goodwill and reputation will suffer substantial loss based on dilution and confusion with respect to its KOOL Marks used for several decades. In stark contrast, any harm Defendant might suffer from an injunction is with respect to the inconvenience associated with the effort and expense to rebrand. First, ITGB does not and has never objected to Defendant's use of BLOOM per se. The harm ITGB is suffering is due to Defendant's use of the interlocking "OO"s, alone and as part of the BLOOM logo.  Notably, as discussed in Section II. B above, Defendant has used at least one other varying brand identifier over time, and can easily shift to a prior logo without significant disruption. Defendant has had constructive notice of ITGB's KOOL Marks since it adopted the interlocking "OO"s and actual notice since at least December 2020.  Had Defendant conducted a simple search of the Federal Trademark Office records  in Class 34 it would have seen ITGB's incontestable registrations and known not to adopt the interlocking "OO"s as part of its mark. Rather than re-brand, Defendant has denied wrongdoing and continued its plans to

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

expand. Accordingly, this factor weighs strongly in favor of granting a preliminary injunction.

### 2.     Public Interest

"Preventing consumer confusion serves the public interest." *Stark v. Diageo Chateau & Estates Wines Co.,* 907 F.Supp.2d 1042, 1067 (N.D. Cal. 2012). First, as discussed above, there is a risk of confusion here. Second, an injunction would protect the public from purchasing and using unregulated products of unknown quality when they intend to purchase legal and regulated tobacco products. Finally, the public has a strong interest in protecting ITGB's KOOL Marks given that Defendant is a serial infringer as shown in Section II. B. above. *See Go Daddy Operating Co., LLC v. Ghaznav*i, No. 17-cv-06545-PJH, 2018 U.S. Dist. LEXIS 33002, at *39 (N.D. Cal. Feb. 28, 2018) (granting preliminary injunction and finding the public had a strong interest in protecting trademarks at issue where defendants were serial infringers and evaded attempts to police their infringing conduct by pleading ignorance).

## IV.     ANY BOND SHOULD BE MINIMAL

Rule 65(c) of the Federal Rules of Civil Procedure requires that ITGB post a bond before the issuance of a preliminary injunction, "in such sum as the court deems proper," for the payment of any costs or damages [Defendant] may incur from a potentially "wrongful" injunction. Fed. R. Civ. P. 65(c). Here, any harm to Defendant would be minimal because it will not be restrained from using non-infringing marks, including those it has used in the past, to promote its business and sell its products. Moreover, ITGB's likelihood of succeeding on the merits at trial is high, making the likelihood of "wrongful" injunction low. If the court requires a bond at all, it should be in the amount of no more than $10,000.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

## V.   **CONCLUSION**

For all the reasons ITGB set forth in its motion and this supporting memorandum, ITGB requests that the Court issue a preliminary injunction against Defendant with at least the following terms: (1) during the pendency of this action, Defendant and its officers, agents, employees, attorneys, and all persons who are in active concert or participation with Defendant are prohibited from promoting, offering to sell, selling, and/or taking additional orders for the infringing products; (2) during the pendency of this action, Defendant and its officers, agents, employees, attorneys, and all persons who are in active concert or participation with Defendant are prohibited from expanding the promotion or sale of its infringing products to new territories; (3) during the pendency of this action, Defendant must place its distributors and/or retailers on notice of the injunction and that they are prohibited from promoting or selling infringing product, Defendant must prepare such notice within three business days of the issuance of the injunction, and ITGB has three business days to approve the form of notice; and (4) Defendant must file with the Court within thirty days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.


Dated:  April 26, 2021                Respectfully submitted,

DYKEMA GOSSETT LLP

By:  _/s/ Abirami Gnanadesigan_
Jon D. Cantor
Abirami Gnanadesigan
Attorneys for Plaintiff, ITG BRANDS, LLC

065887.001180  4814-5763-9397.3

ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION