JOSHUA M. MASUR  (SBN 203510)
  *jmasur@zuberlawler.com*
**ZUBER LAWLER LLP**
2000 Broadway Street, Suite 154
Redwood City, California 94063
Telephone: (213) 596-5620
Facsimile: (213) 596-5621

Attorneys for Defendant
Capna Intellectual

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ITG BRANDS, LLC, | Case No. 2:21-CV-00818-ODW-PVC |
| Plaintiff, | **DEFENDANT CAPNA INTELLECTUAL'S OPPOSITION TO PLAINTIFF ITG BRANDS LLC'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CAPNA INTELLECTUAL, | |
| Defendant. | [*Filed Concurrently with Declarations of Vitaly Mekk and Joshua Masur*] |
| | Judge:  Hon. Otis D. Wright, II |
| | Date:   June 7, 2021 |
| | Time:   1:30 p.m. |
| | Crtrm.:  5D |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF RELEVANT FACTS ................................................... 1

    A.   Capna's creation and use of its BLOOM house mark ........................... 1

    B.   Plaintiff's rapidly declining KOOL cigarettes brand ............................ 2

    C.   The marks at issue ................................................................................. 4

III.   ARGUMENT ........................................................................................... 5

    A.   The burden for a preliminary injunction is very high ........................... 5

    B.   Plaintiff cannot demonstrate a likelihood of success on
        the merits ............................................................................................... 6

        1.   Plaintiff is not likely to prevail on its trademark
            infringement claims ...................................................................... 6

            (a)   The parties' marks are not similar ....................................... 7

            (b)   Plaintiff's Interlocking O Marks are not strong ................. 9

            (c)   KOOL cigarettes and BLOOM cannabis products
                    are not proximate, are not sold in the same
                    marketing channels, and KOOL is not going to
                    expand into BLOOM's market ........................................ 11

            (d)   Cigarette smokers and cannabis vape users exercise
                    a high degree of care in selecting products,
                    weighing against confusion ............................................. 13

            (e)   Capna had no intent to trade on the KOOL
                    trademark ...................................................................... 14

            (f)   There is no evidence of any actual confusion ................... 14

            (g)   Plaintiff cannot show any likelihood of confusion ......... 15

            2.   Plaintiff is unlikely to prevail on its trademark dilution
            claims, which should not even survive Capna's motion to
            dismiss ...................................................................................... 15

            (a)   The KOOL Word Marks cannot be diluted because
                    the BLOOM marks are not at all similar ......................... 16

(b)     Plaintiff's Interlocking O Marks are not famous. ............ 16

(c)     The BLOOM marks do not blur or tarnish the
KOOL marks. .................................................................... 19

C.    Plaintiff cannot show irreparable harm. ................................................. 21

D.    A preliminary injunction is not in the public interest. .......................... 22

E.    Any preliminary injunction should be narrowly
tailored to only enjoin the uncolored, isolated
interlocking circle mark. .................................................................... 22

IV.    CONCLUSION ........................................................................................... 24

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

<u>Cases</u>

4

*Academy of Motion Picture Arts and Scis. v. Creative House*
    *Promotions, Inc.*,
    944 F.2d 1446 (9th Cir. 1991)................................................................6

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).............................................................21

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)........................................................passim

*Anhing Corp. v. Thuan Phong Co. Ltd.*,
    No. CV 13-05167-BRO, 2014 WL 11456533
    (C.D. Cal. Oct. 24, 2014) ....................................................................16

*Arcona, Inc. v. Farmacy Beauty, LLC*,
    976 F.3d 1074 (9th Cir. 2020)...............................................................9

*Arcona, Inc. v. Farmacy Beauty, LLC*,
    No. 2:17-cv-07058-ODW, 2019 WL 1260625
    (C.D. Cal., May 23, 2019) .....................................................................9

*Avery Dennison Corp. v. Sumpton*,
    189 F.3d 868 (9th Cir. 1999).........................................................17, 18

*BOSE Corp. v. OSC Audio Prods., Inc.*,
    293 F.3d 1367 (Fed. Cir. 2002)............................................................18

*Brookfield Comms., Inc. v. West Coast Ent. Corp.*,
    174 F.3d 1036 (9th Cir. 1999)..........................................................7, 15

*Century 21 Real Estate Corp. v. Sandlin*,
    846 F.2d 1175 (9th Cir. 1988)...............................................................6

*CI Games S.A. v. Destination Films*,
    No. 2:16-cv-5719-SVW-JC, 2016 WL 9185391
    (C.D. Cal. Oct. 25, 2016) ....................................................................16

*Cohn v. Petsmart, Inc.*,
    281 F.3d 837 (9th Cir. 1997)..........................................................9, 23

*Credit One Corp. v. Credit One Fin., Inc.*,
    661 F. Supp. 2d 1134 (C.D. Cal. 2009)..............................................5, 6

*Deere & Co. v. MTD Prods., Inc.*,
    41 F.3d 39 (2d Cir. 1994)....................................................................20

*Discount Tobacco City & Lottery, Inc. v. United States*,
    674 F.3d 509 (6th Cir. 2012)...............................................................13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Eclipse Assocs. Ltd. v. Data Gen. Corp.*,
   894 F.2d 1114 (9th Cir. 1990) ................................................................ 6

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) .............................................................. 10

*Falcon Rice Mill v. Comm. Rice Mill*,
   725 F.2d 336 (5th Cir. 1984) ................................................................ 10

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ............................................................................... 3

*Generosity.org v. Generosity Beverages, Inc.*,
   No. 2:17-cv-6054-ODW-KS, 2017 WL 6209819
   (C.D. Cal. Dec. 6, 2017) ...................................................................... 23

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ......................................................... 7, 10

*Groupion, LLC v. Groupon, Inc.*,
   859 F. Supp. 2d 1067 (N.D. Cal. 2012) ............................................... 11

*Guess?, Inc. v. Nationwide Time, Inc.*,
   16 U.S.P.Q.2d 1804 (TTAB 1990) ....................................................... 10

*Hero Nutritionals LLC v. Nutraceutical Corp.*,
   No. SACV 11-1195 AG, 2013 WL 4480674
   (C.D. Cal. Aug. 16, 2013) ........................................................ 8, 10, 14

*Lorillard Tobacco Co. v. California Imports, LLC*,
   886 F. Supp. 2d 529 (E.D. Va. 2012) ................................................... 21

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) ......................................................... 16, 20

*MGA Entmt., Inc. v. Dynacraft BSC, Inc.*,
   No. 2:17-cv-8222-ODW-KS, 2018 WL 2448123
   (C.D. Cal. May 30, 2018) ..................................................................... 17

*Mintz v. Subaru of Am., Inc.*,
   716 Fed. Appx. 618 (9th Cir. 2017) ....................................................... 8

*Nissan Motor Co. v. Nissan Comp. Corp.*,
   378 F.3d 1002 (9th Cir. 2004) .............................................................. 17

*Oakland Tribune, Inc. v. The Chronicle Publ'g Co., Inc.*,
   762 F.2d 1374 (9th Cir. 1985) ................................................................ 5

*Playmakers, LLC v. ESPN, Inc.*,
   297 F. Supp. 2d 1277 (W.D. Wash. 2003) ........................................... 21

*Ross v. Target Corp.*,
   No. CV 07-1147-ODW, 2008 WL 11336378
   (C.D. Cal. July 7, 2008) ................................................................... 9, 23

*Teletech Customer Care Mgmt. (California), Inc. v. Tele-Tech Co.*,
   977 F. Supp. 1407 (C.D. Cal. 1997)....................................................18

*Urban Home, Inc. v. Cordillera Investment Co., LLC*,
   No. CV 13-08502-GAF, 2014 WL 3704031
   (C.D. Cal. June 19, 2014) ..................................................................18

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ................................................................................5

*Zheng Cai v. Diamond Hong, Inc.*,
   901 F.3d 1367, 127 USPQ 2d 1797 (Fed. Cir. 2018) ........................8

## <u>Statutes</u>

15 U.S.C. § 1116(a) ......................................................................................21

15 U.S.C. § 1125(c)(2)(A) ...........................................................................17

15 U.S.C. § 1125(c)(2)(B) ...........................................................................19

15 U.S.C. § 1335 .............................................................................................3

Cal. Bus. & Prof. Code § 26000 .................................................................12

## I.    <u>INTRODUCTION</u>

BLOOM and KOOL are as different as cannabis and mentholated tobacco. The marks are dissimilar, the product packaging is not at all alike, and the two companies' products are not even sold in the same stores. It is implausible that any consumer would believe that two entirely different products—with entirely different names, packaging, and marketing—were affiliated simply because the packaging for both includes interlocking circles, a graphic design element more famously associated with brands such as Mastercard, Audi, the Olympics, Gucci, and Chanel. Plaintiff does not own interlocking circle designs.

Capna has no interest in affiliating its premium cannabis products with KOOL cigarettes. KOOL may have had "a worldwide reputation for quality and authenticity" in the 1930s, but in 2021, its reputation is for peddling toxic addictive carcinogens to minorities. Menthol cigarettes escaped a federal ban on flavored cigarettes in 2009, but just since Plaintiff filed its motion, on April 29, 2021, the FDA announced that it will ban menthol cigarettes nationwide. Meanwhile, the nation has moved towards legalization of cannabis, with medical use now legal in 36 states, and adult use either legal or decriminalized in 29 states. Plaintiff alleges "irreparable harm" based on a conclusory allegation of damage to its reputation, but even if consumers somehow implausibly associated BLOOM products with KOOL cigarettes, Plaintiff's reputation is already damaged beyond harm.

Plaintiff's burden to show an entitlement to a preliminary injunction is very high, and Plaintiff has not come close to presenting sufficient evidence to support its motion. The Court should accordingly deny Plaintiff's motion in its entirety.

## II.    <u>STATEMENT OF RELEVANT FACTS</u>

### A.    <u>Capna's creation and use of its BLOOM house mark</u>

Capna started doing business under the BLOOM brand in 2014. Mekk Decl. ¶ 2. It chose to use the brand "BLOOM" because of the association between the word "bloom" and flower, which is the term for the part of the marijuana plant that

1

is consumed. Mekk Decl. at ¶ 2. BLOOM products are aimed at the premium end of the cannabis market, using a food-grade ethanol extraction method to create optimal cannabis oil products without toxic preservatives or additives. Mekk Decl. at ¶ 3. Capna's slogan, "Today Was A Good Day," messages that using BLOOM products are a good way to relax at the end of a good day. Mekk Decl. at ¶ 4. Capna's premium products have achieved critical acclaim within the industry, including, for example, a glowing review from Forbes.com in 2018. Mekk Decl., Ex. 1.

Capna's products are made with, and frequently named for, classic marijuana strains that obtained their public-domain names before Capna began using them. For example, the Pineapple Express product that Plaintiff mentions in its motion (Dkt. No. 31 at 15) is a strain originally developed by nonparty G13 Labs before Capna was founded, and has been sold under that name by many California cannabis companies. Mekk Decl. at ¶ 10. The same is true of Capna's Apple Jack and Skywalker products, both of which are extracts of those respective marijuana strains that were developed before Capna was founded. Mekk Decl. at ¶ 10. Capna has never received any complaints from anyone associated with the movie Pineapple Express, Kellogg's, or LucasFilm/Disney about these products. Mekk Decl. at ¶ 10.

Capna's house mark, a sans-serif BLOOM with the Os intersecting and the intersection colored red, has nothing to do with the KOOL cigarettes logo. Capna decided to use the word "BLOOM" with the Os interlocking, and the intersection colored red, after reviewing several options that were developed independently by a graphic designer. Mekk Decl. at ¶ 6. Capna chose the design of their house mark in part because it had a "clean" look, fitting in with the natural, no-additive image it wanted its BLOOM brand to represent. Mekk Decl. at ¶ 6.

**B.     Plaintiff's rapidly declining KOOL cigarettes brand.**

The market for cigarettes has greatly changed since the KOOL brand was launched in 1933.  Original KOOL manufacturer Brown & Williamson advertised that "Doctors … agree that KOOLs are soothing to your throat," using a cartoon

penguin dressed as a doctor saying, "tell him to switch to KOOLs and he'll be all right." Masur Decl., Ex. 2. But by 2000, when Brown & Williamson challenged FDA regulations concerning cigarette advertising, the Supreme Court identified "thousands of premature deaths that occur each year because of tobacco use" as "one of the most troubling public health problems facing our Nation today." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). "More than 400,000 people die each year from tobacco-related illnesses, such as cancer, respiratory illnesses, and heart disease." *Id.* at 127-28.

Cigarette advertising is heavily restricted due to the well-known dangers of smoking. The federal government banned cigarette advertising on FCC-regulated broadcast television and radio stations 50 years ago. 15 U.S.C. § 1335. In 1998, Brown & Williamson and other major tobacco companies entered a Master Settlement Agreement with state governments that prohibited many tobacco advertising practices, such as the use of cartoon mascots and advertising on outdoor billboards and mass transit. Masur Decl., Ex. 3. Whether due to restrictions on cigarette advertising or lack of promotional benefit, Plaintiff's advertising spend for *all* its brands—including WINSTON and SALEM cigarettes, DUTCH MASTERS cigars, and BLU electronic cigarettes—is only about $5.5 million a year, coincidentally the same amount as the average cost of a single 30-second Super Bowl advertisement in 2021. *Compare* Dkt. No. 31 at 11 to Masur Decl., Ex. 4.

Even within the cigarette industry, the KOOL brand is weak. KOOL had less than 2% of the United States market share as of 2017; fourth place among *menthol* cigarettes. Masur Decl., Ex. 5. Even assuming that, as Plaintiff asserts, 82.8% of adult tobacco consumers are aware of the KOOL brand (Dkt. No. 31 at 11), very few of them choose it as their preferred brand.

Menthol cigarette brands have acquired a particularly negative reputation. They are disproportionately used by African Americans, and advertising for KOOL and other cigarettes has been targeted accordingly. *See* Masur Decl., Ex. 5.

1  Plaintiff's own advertising samples in its opposition to Capna's motion to dismiss
2  disproportionally feature African Americans. (Dkt. No. 32-1, Ex. A at 13-18).
3  Targeting of advertisements for menthol cigarettes drove the African American
4  Tobacco Control Leadership Council and Action on Smoking and Health to file suit
5  against the FDA, demanding a ban on menthol cigarettes, like other flavored
6  cigarettes, and on April 29, after Plaintiff filed its motion, the FDA announced that
7  it would do so. Masur Decl., Exs. 6, 7. Last year in California, the sale of menthol
8  cigarettes was outlawed by the legislature, but implementation of the law has been
9  suspended pending a November 2022. Masur Decl., Ex. 8.

10      The KOOL brand is limited to tobacco cigarettes; any expansion into any
11  other category would almost certainly use a different brand name. This is evident
12  from Plaintiff's own brand portfolio, which includes BLU electronic cigarettes but
13  no KOOL electronic cigarettes. Dkt. No. 31 at 9. There is no evidence that Plaintiff
14  or its predecessors have ever used, or ever considered using, the KOOL mark on any
15  goods other than tobacco cigarettes and, at one point, collectibles.

16      **C.**    **The marks at issue.**

17      Although Plaintiff's motion for preliminary injunction repeatedly refers to all
18  of its trademarks collectively as "the KOOL Marks," it in fact owns two very
19  different sets of marks: three marks for the entire word "KOOL"; and two for only
20  the interlocking-Os logo. *See* Dkt. No. 31-1 at ¶ 13 (Regs. Nos. 508538, 747482,
21  and 2218589 for "KOOL Word Marks"; Nos. 2,578,658 and 2,617,994 for
22  "Interlocking O Marks"). Each registration identifies the only class of goods as
23  "cigarettes." *Id.* Notably, though the KOOL brand dates back to 1933, the first use
24  of the Interlocking O marks was in 2000. *Id.* Almost all of Plaintiff's examples more
25  prominently display a KOOL Word Mark alongside the Interlocking O Mark, rather
26  than the Interlocking Os in isolation. *See* Dkt. No. 32-1, Ex. A at 6-23. All of the
27  examples of KOOL advertising provided by Plaintiff are dominated by the colors
28  green or blue, colors associated with menthol flavoring. *Id.*

1    In contrast, Capna's BLOOM house mark uses a dissimilar font—a sans-serif
2    BLOOM with the Os linked, typically with a red intersection of the Os. Dkt. No. 31
3    at 13. Every allegedly infringing ad identified by Plaintiff prominently uses the
4    color red—the exact opposite of green on the color wheel, one associated with heat
5    rather than KOOL's menthol flavors and related colors. *Id.* at 13, 19. As shown by
6    Plaintiff's own comparison tables, there is nothing similar about the two companies'
7    product packaging other than the inclusion of Interlocking Os alongside much
8    clearer identifying information on both companies' packages. *See* id. at 19.

9    **III.   ARGUMENT**

10    No consumer is likely to confuse BLOOM cannabis with KOOL cigarettes,
11    and Plaintiff cannot point to any irreparable harm it will likely suffer. If any party
12    faces irreparable harm, it is Capna, which would be forced to recall its products and
13    lose millions of dollars in sales while incurring additional liability to its franchisees,
14    potentially bankrupting the company. The Court should not enjoin Capna—but if it
15    does, that injunction should be sharply limited to only the few uses that might
16    conceivably infringe, and should not require any recall of existing products.

17    **A.   The burden for a preliminary injunction is very high.**

18    A preliminary injunction "is an extraordinary remedy never awarded as of
19    right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). "To obtain a preliminary
20    injunction, the movant must establish: (1) a likelihood of success on the merits; (2) a
21    likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of
22    equities tips in his favor; and (4) an injunction is in the public interest." *Credit One
23    Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1137 (C.D. Cal. 2009) (citing
24    *Winter*, 555 U.S. at 20). While the Ninth Circuit uses a "sliding scale" analysis in
25    which more severe irreparable harm may require less likelihood of success, a
26    plaintiff must in any case "demonstrate some significant threat of irreparable injury
27    to warrant injunctive relief." *Oakland Tribune, Inc. v. The Chronicle Publ'g Co.,
28    Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985).

**B.**      <u>**Plaintiff cannot demonstrate a likelihood of success on the merits.**</u>

Plaintiff cannot show that Capna's BLOOM house mark is likely to cause any confusion with its own marks, nor that Plaintiff's Interlocking O mark is famous, nor that any of its marks are at any risk of dilution. It therefore is unlikely to prevail on any of its claims, for trademark infringement, dilution, or unfair competition.

1.      ***Plaintiff is not likely to prevail on its trademark infringement claims.***

To show trademark infringement, Plaintiff must demonstrate "that it owns a valid mark, that the mark was used without its consent, and that such unauthorized use is likely to cause confusion, mistake, or deception." *Credit One*, 661 F. Supp. 2d at 1137. The "ultimate test" of trademark infringement "is whether the public is likely to be deceived or confused by the similarity of the marks." *Id.* As Plaintiff notes, the elements of its unfair competition claims are essentially identical. Dkt. No. 31 at 16 (citing *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988); *Academy of Motion Picture Arts and Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991). Plaintiff may own the KOOL marks, and it hasn't authorized Capna to use them, but it simply cannot show that the public is likely to be deceived or confused by the similarity of the marks.

In the Ninth Circuit, courts analyze whether an allegedly infringing mark creates a likelihood of confusion by applying the *Sleekcraft* factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product line. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These factors are guidelines for use in determining whether the public is likely to be deceived or confused by the similarity of the marks; they are not rigid requirements. *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990).

1          (a)     *The parties' marks are not similar.*

2          The "similarity of the marks" factor "has always been considered a critical

3    question in the likelihood-of-confusion analysis." *GoTo.com, Inc. v. Walt Disney*

4    *Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). The marks must be considered in their

5    entirety and as they appear in the marketplace; similarity is adjudged in terms of

6    appearance, sound, and meaning; and similarities are weighed more heavily than

7    differences. *Id.* at 1206. "Where the two marks are entirely dissimilar, there is no

8    likelihood of confusion." *Brookfield Comms., Inc. v. West Coast Ent. Corp.*, 174

9    F.3d 1036, 1054 (9th Cir. 1999).

10         Because Bloom's marks are entirely dissimilar to the KOOL Word Marks,

11   there can be no likelihood of confusion between them. BLOOM and KOOL are

12   entirely different words; they look different, they sound different, and they mean

13   different things. "KOOL" is an intentional misspelling of "cool," referring to the

14   menthol flavor of KOOL cigarettes. "BLOOM" has no association whatsoever with

15   menthol flavor; no Capna product even has a mint or menthol flavor. Mekk Decl. at

16   ¶ 11. Perhaps conceding the obvious, Plaintiff does not even attempt to argue that

17   there is any similarity between the KOOL Word Marks and the BLOOM house

18   mark, focusing exclusively on the Interlocking O Marks in discussing similarity.

19   Dkt. No. 31 at 19-20. As to the KOOL Word Marks, the facial dissimilarity should

20   end the analysis; the two marks are entirely dissimilar, and so regardless of the other

21   *Sleekcraft* factors, there is no likelihood of confusion. *Brookfield*, 174 F.3d at 1054.

22         When "considered in their entirety and as they appear in the marketplace,"

23   even the interlocking Os are not similar. Plaintiff cannot point to any BLOOM

24   packaging in the marketplace that is similar, when viewed in its entirety, to KOOL

25   packaging. Plaintiff's own graphic undermines its theory that consumers will view a

26   BLOOM vape package, ignore the color, text, product name, and descriptive text—

27   none of which suggest any association with KOOL—and somehow conclude that

28   BLOOM vapes are associated with KOOL because they contain interlocking Os:

| ITGB'S USE OF KOOL MARKS | DEFENDANT'S USE OF BLOOM MARKS |
|---|---|
|  |  |

Dkt. No. 31 at 19. But as Plaintiff correctly points out, "[t]he test is not whether the marks can be distinguished in a side-by-side comparison, but rather whether their overall commercial impressions are so similar that confusion as to the source of the goods and services offered under the respective marks is likely to result." Dkt. No. 31 at 20 (citing *Zheng Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ 2d 1797, 1801 (Fed. Cir. 2018)). That rule weighs in Capna's favor, not Plaintiff's. The Ninth Circuit explained in *Mintz v. Subaru of America, Inc.*, 716 Fed. Appx. 618, 621 (9th Cir. 2017), that where the only similarity between the plaintiff's design and the defendant's is "the use of a common symbol," the designs are "so facially dissimilar they cannot plausibly create a likelihood of confusion." Similarly, *Hero Nutritionals LLC v. Nutraceutical Corp.*, No. SACV 11-1195 AG, 2013 WL 4480674, at *6 (C.D. Cal. Aug. 16, 2013), found that where the product labels at issue were completely different in all respects other than their use of the words "yummy" and "yummi," the marks were "dissimilar and easily distinguishable.

Moreover, Capna uses interlocking circles in or with its own distinctive house mark, generally as part of the word BLOOM and with the intersection of the circles colored red. This Court knows better than most that this reduces any arguable likelihood of confusion. In a recent counterfeiting case, *Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-cv-07058-ODW, 2019 WL 1260625 (C.D. Cal., May 23,

2019), this Court found that the fact that "[e]ach product bears [the parties'] respective house marks [and] presents a distinct color and packaging scheme" mandated summary judgment against that plaintiff. *Id.* at *3. Indeed, in upholding this Court's decision, the Ninth Circuit went even further: "it is implausible that a consumer would be deceived because the products had their respective housemarks ('Farmacy' vs. 'Arcona') prominently on the packaging…. In trademark infringement cases, the 'use of a housemark can reduce the likelihood of confusion.'" *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1081 (9th Cir. 2020) (citations omitted) (quoting *Sleekcraft*, 599 F.2d at 351; *see also, e.g., Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 1997) (upholding summary judgment of noninfringement where parties used "identical slogan as a trademark" but their housemarks 'ha[d] the potential to reduce or eliminate likelihood of confusion'" (citation omitted)); *accord, e.g., Ross v. Target Corp.*, No. CV 07-1147-ODW, 2008 WL 11336378, at *7 (C.D. Cal. July 7, 2008) (quoting same).

The only similarity between KOOL packaging and BLOOM packaging is the use of a common symbol: interlocking circles. No matter how many arrows Plaintiff draws, even the comparison chart that Plaintiff provided in its own motion establishes that the commercial impressions of the two marks are hardly similar.

       (b)   *Plaintiff's Interlocking O Marks are not strong.*

Plaintiff has proffered no evidence that a consumer who sees two interlocking Os outside the context of a KOOL cigarette pack or advertisement thinks of KOOL cigarettes. Interlocking circles or circular letters are a common graphic design motif. One can find them in such other more famous marks as the Olympic rings, and the logos for Audi, Mastercard, Gucci, and Chanel, each reproduced below:

    

Common symbols are considered to be weak marks deserving of little protection. *See, e.g.*, *Guess?, Inc. v. Nationwide Time, Inc.*, 16 U.S.P.Q.2d 1804, 1806 (TTAB 1990) ("applicant's equilateral triangle design is inherently nondistinctive"); *Falcon Rice Mill v. Comm. Rice Mill*, 725 F.2d 336, 346 (5th Cir. 1984) (color and design aspects of a mark are usually given weak protection).  Moreover, "extensive use of similar marks by third-parties reduces the commercial strength of a mark." *Hero Nutritionals*, 2013 WL 4480674, at *4; *compare, e.g.*, *GoTo.com*, 202 F.3d at 1207 ("The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded"). Plaintiff has offered no evidence whatsoever that its use of a common symbol has acquired any secondary meaning that would create distinctiveness where none inherently exists.

Instead, Plaintiff relies on the incontestability of its registrations and its "commercial strength." But incontestable status is gained by the length of time that a registration has existed, and says little about the strength of a mark; it certainly "does *not* require a finding that the mark is strong." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n. 3 (9th Cir. 2002) (emphasis in original); *Hero Nutritionals*, 2013 WL 4480674, at *4 ("incontestable mark may ... still be relatively weak for likelihood of confusion purposes" (citation omitted)). As for commercial strength, Plaintiff points to its annual advertising expenditures of $5.5 million for *all* its brands, not limited to KOOL, as though it were a large amount.  But in 2018, according to the CDC, Plaintiff spent a fraction of one percent of the $9.06 billion in U.S. advertising and promotional expenses for the cigarette industry as a whole. Masur Decl., Ex. 9. Plaintiff does not identify what percentage of its promotional expenditures and materials relate to KOOL, as opposed to its WINSTON and SALEM cigarettes, DUTCH MASTERS cigars, and BLU electronic cigarettes brands, much less those that prominently displayed the Interlocking O Mark without the word "KOOL" to provide context. The examples Plaintiff has provided in its motion almost uniformly display the Interlocking Os along with more prominent

1   KOOL Word Marks. *See* Dkt. No. 32-1, Ex. A at 6-23. The Interlocking O Marks

2   are a weak, commonly used, abstract symbol, and this factor favors Capna.

3          (c)   *KOOL cigarettes and BLOOM cannabis products are not*

4                *proximate, are not sold in the same marketing channels, and*

5                *KOOL is not going to expand into BLOOM's market.*

6          Menthol cigarettes and cannabis vapes generally are not sold to the same

7   customers or in the same stores. "To determine whether goods are related, courts

8   may consider whether the goods are complementary, whether the products are sold

9   to the same class of purchasers, and whether the goods are similar in use and

10  function." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1074 (N.D. Cal.

11  2012); *see* Dkt. No. 31 at 20-21 (quoting same). Menthol tobacco cigarettes and

12  cannabis vapes are self-evidently not complementary, not sold to the same class of

13  purchasers, and are not similar in use and function. KOOL cigarettes are a

14  physically addictive stimulant; BLOOM cannabis vapes are not. BLOOM cannabis

15  vapes are sold at licensed dispensaries; KOOL cigarettes are not.

16         Plaintiff responds to the obvious fact that BLOOM products do not compete

17  with KOOL cigarettes by suggesting that somehow, consumers would know that

18  Plaintiff's parent company invested in a biotech company researching medicinal

19  cannabis and would therefore think that KOOL expanded into cannabis vapes. Dkt.

20  No. 31 at 20-21. The idea that a consumer who is sophisticated enough to have

21  detailed knowledge of tobacco industry investment strategies might be confused

22  between a cannabis vape brand and a menthol cigarette brand is comical. But such a

23  sophisticated consumer would have no reason to believe Plaintiff would use the

24  KOOL mark for cannabis electronic vapes, when Plaintiff uses its BLU mark for e-

25  cigarettes. Dkt. No. 31 at 9. The question as to proximity of goods sold is whether

26  consumers would reasonably believe the allegedly infringed KOOL mark is

27  proximate, not whether the mark's owner happens to have other goods under an

28  unrelated brand that are proximate.

1    Plaintiff's other response is circular reasoning: even if cannabis is not in
2  KOOL's natural zone of expansion, Plaintiff is the senior user and therefore is
3  entitled to enjoin junior users. Dkt. No. 31 at 21. But a senior user is only entitled to
4  enjoin junior users if there is likelihood of confusion, which Plaintiff has failed to
5  show. Because the goods are not proximate, this *Sleekcraft* factor favors Capna.

6    As to similarity of marketing channels, Plaintiff must concede that as a matter
7  of state law, BLOOM cannabis vapes containing THC must be sold in licensed
8  dispensaries, and cannot be sold at convenience stores alongside KOOL cigarettes.
9  Cal. Bus. & Prof. Code § 26000 *et seq*. Plaintiff therefore instead speculates that at
10  some point, Capna may sell BLOOM CBD vapes, which may then be sold alongside
11  KOOL cigarettes. Dkt. No. 31 at 21-22. But as an initial matter, Capna's registration
12  for BLOOM for CBD oral vaporizers is an Intent to Use Application; Capna does
13  not currently sell any BLOOM CBD vaporizers at convenience stores or anywhere
14  else other than licensed marijuana dispensaries. Mekk Decl. at ¶ 12. There is
15  nothing to enjoin—and if and when BLOOM CBD vaporizers are sold in
16  convenience stores, it may be illegal for those stores to sell KOOL cigarettes. And
17  even if the products were sold at the same stores, they are entirely different products
18  with entirely different customers; just as no consumers are presumably confused
19  into believing that there is any affiliation between KOOL cigarettes and Cool Ranch
20  Doritos—much more commonly found at convenience stores—so too will no
21  consumers be confused into believing that there is any affiliation between the
22  hypothetical future BLOOM CBD vapes and KOOL menthol cigarettes.

23    The same facts also show why the eighth *Sleekcraft* factor—likelihood of
24  expansion into other markets—weighs in Capna's favor. KOOL and BLOOM are
25  never going to compete with each other. Capna has no intent to make tobacco
26  products. Mekk Decl. at ¶ 13. And even if Plaintiff expands into cannabis at some
27  time in the future, it cannot show that it is likely to do so using the KOOL mark.
28  When Plaintiff did expand into nicotine-containing e-cigarettes, it did so under the

1    BLU mark. Dkt. No. 31 at 9. And if Plaintiff does expand into cannabis, it will be

2    the junior user within that industry, not the senior user; all of its trademarks are

3    limited to cigarettes. Dkt. No. 20 at ¶ 16. Plaintiff's KOOL products and Capna's

4    BLOOM products do not compete in any way, and so each of these three *Sleekcraft*

5    factors—proximity of goods sold, similarity of marketing channels, and likelihood

6    of expansion into other markets—all favor Capna.

7              (d)    *Cigarette smokers and cannabis vape users exercise a high*

8                     *degree of care in selecting products, weighing against confusion.*

9              The more caution a typical buyer uses in selecting the types of goods at issue,

10   the less likely it is that the buyer is likely to be confused by any similarity in marks.

11   *See Sleekcraft*, 599 F.2d at 353. Leaving aside the absurd thought that a consumer

12   who intends to purchase a menthol cigarette might inadvertently purchase a

13   cannabis vape instead (or vice versa), cigarette smokers' brand loyalty is notorious.

14   In its decision upholding numerous restrictions on tobacco advertising, the Sixth

15   Circuit observed, citing a report from the United States Surgeon General, that "adult

16   tobacco users are extremely brand loyal and are unlikely to switch products."

17   *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 540 (6th Cir.

18   2012). It is precisely because smokers are "known to be extremely brand loyal" that

19   tobacco companies targeted their advertising to young smokers, and that the

20   government accordingly passed laws and regulations to prohibit such advertising. *Id*.

21             Plaintiff focuses on price over brand loyalty, but does so misleadingly.

22   BLOOM products are not cheap; its vaporizer cartridges typically range in price

23   from $30 to $60. Mekk Decl. at ¶ 14.  And while its TREAT pre-rolls are cheaper

24   per unit—ranging from $9 to $14—those prices are for a single pre-rolled joint, not

25   a pack of 20. Mekk Decl. at ¶ 14. These products are expensive for single-use

26   consumables that require customers to seek out a specialized store, a cannabis

27   dispensary, to purchase them. Customers are far more likely to take care when

28   purchasing these items than they would a typical item of a comparable price.

(e)     *Capna had no intent to trade on the KOOL trademark.*

It makes no more sense to claim that Capna's use of Interlocking Os shows an intent to trade on KOOL's trademark than it would to claim that Capna sought to trade on Mastercard's, Audi's, or the Olympics' trademarks. Capna positions its BLOOM brand as a premium brand with a reputation for high quality, all-natural cannabis. Mekk Decl. at ¶¶ 3, 6, 8, 13. It interlocked the Os in BLOOM because interlocking Os are a common and attractive graphic design element that fit the desired brand image for BLOOM, not because it had any desire to associate its product with a toxic product, tobacco cigarettes, that kills hundreds of thousands of Americans each year. Mekk Decl. at ¶¶ 6-7.

The fundamental dissimilarity of BLOOM's packaging demonstrates a lack of intent. As in *Hero Nutritionals*, even if the interlocking circles element of the two brands is similar, Capna's use of interlocking circles in its BLOOM mark is not sufficiently similar to Plaintiff's use of interlocking circles to warrant a presumption that Capna chose its marks to deceive the public. 2013 WL 4480674, at *7. But unlike in *Hero Nutritionals*, there is no evidence that Capna was even aware of KOOL's interlocking circles mark; it is in a different industry and Plaintiff's is far from the most famous use of interlocking circles in advertising. *Id.* Thus, even though the court in *Hero Nutritionals* found that the defendant's intent factor was neutral, that factor should weigh in Capna's favor here.

(f)     *There is no evidence of any actual confusion.*

Plaintiff's motion discusses seven of the eight *Sleekcraft* factors, but tellingly, omits any mention, let alone evidence, of actual confusion.[1] Dkt. No. 31 at 17-23. Were confusion reasonably likely, one would think Plaintiff could find at least one consumer or store that was actually confused. Capna certainly has seen no evidence of any actual confusion. Mekk Decl. at ¶ 7. This factor accordingly weighs in Capna's favor as well.

---

[1] Any attempt by Plaintiff to address actual confusion on reply should be stricken.

14

(g)     *Plaintiff cannot show any likelihood of confusion.*

As to the KOOL Word Marks, the analysis begins and ends with the fundamental dissimilarity of the marks. There simply is nothing similar about the meaning, graphic design, or the words themselves between KOOL and BLOOM. There can be no more infringement of the KOOL Word Marks by BLOOM than "Pepsi" could infringe "Coke." *See Brookfield*, 174 F.3d at 1054. At that point, the remaining *Sleekcraft* factors do not matter. *Id.*

As to the Interlocking O Marks, the only factor that could conceivably weigh in Plaintiff's favor is the similarity of the marks in isolation. But the Interlocking O Marks are inherently weak as a mark, Capna uses interlocking circles differently than Plaintiff, the two companies' products are not at all competitive, there is no indication that Plaintiff would ever use the KOOL brand for cannabis even if it expands in that direction, consumers of cigarettes are famously brand loyal and likely to take care in selecting their products, there is no evidence of bad intent on Capna's part, and there is no evidence of actual confusion whatsoever. When every *Sleekcraft* factor weighs in Capna's favor, the common use of an abstract symbol shared by many other brands cannot create a likelihood of confusion.

Plaintiff is unlikely to prevail on the merits of its trademark infringement and unfair competition claims, and its motion should be denied.

2.     ***Plaintiff is unlikely to prevail on its trademark dilution claims, which should not even survive Capna's motion to dismiss.***

Capna has moved to dismiss Plaintiff's trademark dilution claim because it cannot even plausibly allege that the KOOL Word Marks are diluted or that the Interlocking O Marks are famous. Dkt. No. 22. But even if Plaintiff's trademark dilution claim survives Capna's motion to dismiss, Plaintiff cannot rest on its pleadings to obtain a preliminary injunction, but must present a "clear showing" that it is likely to succeed on the merits. *CI Games S.A. v. Destination Films*, No. 2:16-

1   cv-5719-SVW-JC, 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016). Here,

2   Plaintiff has made no such "clear showing" to support its dilution claim.

3          (a)   *The KOOL Word Marks cannot be diluted because the BLOOM*

4                *marks are not at all similar.*

5          Trademark dilution claims are designed to protect against the loss of value to

6   a trademark when it is used to identify different products. Unlike trademark

7   infringement, dilution "usually occurs when customers *aren't* confused about the

8   source of a product: Even if no one suspects that the maker of analgesics has entered

9   into the snowboard business, the Tylenol mark will now bring to mind two products,

10  not one." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002)

11  (emphasis in original). Even though the trademark dilution statute was modified to

12  no longer require that the conflicting marks be identical, the marks still "must be so

13  very closely similar that they will be seen as essentially the same mark. If a court

14  has found that the conflicting marks are not similar enough to meet the likelihood of

15  confusion test, then, by definition, they are not similar enough for dilution to be

16  likely to occur." *Anhing Corp. v. Thuan Phong Co. Ltd.*, No. CV 13-05167-BRO,

17  2014 WL 11456533, at *14 (C.D. Cal. Oct. 24, 2014).

18         The KOOL Word Marks cannot be diluted by BLOOM packaging because

19  they are too dissimilar. As discussed above, KOOL and BLOOM are entirely

20  different words with entirely different meanings, sharing only a double-O. BLOOM

21  does not dilute KOOL any more than it dilutes GOOGLE, YAHOO!, or FRUIT OF

22  THE LOOM. As with its likelihood of confusion argument, Plaintiff does not even

23  attempt to argue that the KOOL Word Marks are diluted, focusing in that section

24  only on the Interlocking Os. Dkt. No. 31 at 26-27. It does not matter how famous the

25  KOOL Word Marks are, they cannot possibly be diluted by BLOOM.

26         (b)   *Plaintiff's Interlocking O Marks are not famous.*

27         Plaintiff's motion misleadingly conflates the KOOL Word Marks with the

28  Interlocking O Marks, referring to them collectively as the "KOOL Marks." In an

1   attempt to show fame, KOOL relies on packaging and advertising that prominently

2   displays the KOOL Word Marks. But to argue dilution, it ignores the dissimilarity

3   between the KOOL Word Marks and the BLOOM marks, and points only to the

4   similarity between the Interlocking O Marks and the BLOOM circles. The

5   commercial success of the product as a whole cannot show the fame of an isolated

6   portion of the packaging, any more than other slogans on KOOL packaging,

7   generally unknown to nonsmokers, such as "True Menthol" or "The House of

8   Menthol." *See* Dkt. No. 32-1, Ex. A at 6-12. Though Plaintiff touts a previous court

9   decision finding the "KOOL Marks" famous, that case only addressed U.S.

10  Trademark Registration Nos. 508,538 and 747,482, the KOOL Word Marks, not

11  either of ITG's registrations for the Interlocking O Marks. *Compare* Dkt. No. 31-1

12  at ¶ 13 (listing ITG's trademark registrations) to Dkt. No. 26-4, Ex. 13 at ¶ 20. That

13  court's decision describes the marks at issue as "distinctive trademarks consisting of

14  the word 'KOOL,'" not as trademarks consisting of interlocking O's. Dkt. No. 26-4,

15  Ex. 13 at ¶ 19.

16      Plaintiff still cannot show that the Interlocking O Marks are "widely

17  recognized by the general consuming public of the United States as a designation of

18  source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

19  Fame is a high standard, requiring a showing that the mark is comparable "to that of

20  other household names, such as Budweiser beer." *MGA Entmt., Inc. v. Dynacraft*

21  *BSC, Inc.*, No. 2:17-cv-8222-ODW-KS, 2018 WL 2448123, at *6 (C.D. Cal. May

22  30, 2018). Plaintiff's evidentiary requirement is especially high given that

23  "widespread use" of interlocking circles in the marks "of other companies makes

24  fame unlikely"—particularly where those other uses are more famous. *Nissan Motor*

25  *Co. v. Nissan Comp. Corp.*, 378 F.3d 1002, 1014 (9th Cir. 2004) (citing *Avery*

26  *Dennison Corp. v. Sumpton*, 189 F.3d 868, 878 (9th Cir. 1999)). As pointed out

27  above, interlocking circles or letters are a common design element used in marks

28  such as the Olympic Rings and the logos for Mastercard, Audi, Chanel, and Gucci.

In view of those more famous logos, KOOL must show that the general consuming public would recognize interlocking Os in isolation as a designation for KOOL cigarettes, not merely that the general consuming public recognizes the KOOL name and that KOOL packaging and advertising sometimes uses interlocking Os outside the context of the word KOOL. Plaintiff has not done so, and cannot do so.

Plaintiff's evidence of sales to smokers does not show the requisite fame among "the general consuming public." Assuming a 5 pack per week[2] habit by the average KOOL smoker, 1 billion packs of KOOL cigarettes over 6 years would amount to about 640,000 smokers—not even 1% of the country. An the cases on which Plaintiff relies to argue that its level of commercial success demonstrates fame, *Teletech Customer Care Mgmt. (California), Inc. v. Tele-Tech Co.*, 977 F. Supp. 1407, 1413 (C.D. Cal. 1997) and *BOSE Corp. v. OSC Audio Products, Inc.*, 293 F.3d 1367, 1371-73 (Fed. Cir. 2002) (cited at Dkt. No. 31 at 25), applied a more generous, pre-2006 version of the trademark dilution statute, which permitted a mark to qualify for protection as famous if it had "fame in a narrow market segment." *See Avery Dennison*, 189 F.3d at 878 (discussing *Teletech*); *Urban Home, Inc. v. Cordillera Investment Co., LLC*, No. CV 13-08502-GAF, 2014 WL 3704031, at *6 (C.D. Cal. June 19, 2014) ("The trademark dilution statue was revised in 2006 to deny protection to marks whose fame extends only to niche markets"). They are irrelevant today.

Moreover, very little of KOOL's packaging and advertising shows the Interlocking Os in isolation. As discussed *supra* at Section III.B.1.a, a quick glance at KOOL's packaging and advertisements shows that the interlocking Os are a far less significant part of the overall design than the KOOL Word Marks or the green and blue colors, neither of which are shared by BLOOM's packaging.

---

[2] In 2016, the average cigarette smoker smoked 14 cigarettes per day, or about 5 packs per week. Masur Decl., Ex. 10.

1     Plaintiff's claims to fame in 2021, as put forth in its motion and

2  accompanying declarations, are dubious even for the KOOL Word Marks. $5.5

3  million in advertising (Dkt. No. 31 at 25) is far lower than one would expect from a

4  famous mark; as noted previously, it is about the cost of a single Super Bowl

5  advertisement. *See* Masur Decl., Ex. 4. And that $5.5 million in annual advertising,

6  according to the Graves Declaration, is for Plaintiff as a whole—which includes

7  WINSTON and SALEM cigarettes, DUTCH MASTERS cigars, and BLU electronic

8  cigarettes alongside the KOOL brand. Dkt. No. 31-1 at ¶¶ 3, 10. Plaintiff claims that

9  the brand's fame is demonstrated by "celebrities who are captured wearing t-shirts

10  displaying the KOOL brand," (Dkt. No. 31 at 25, citing Dkt. No. 26-4, Ex. 12), but

11  the fact that Saturday Night Live cast member Pete Davidson once wore a shirt with

12  the KOOL logo—but not the Interlocking O Marks in isolation—is insufficient to

13  establish relevant fame. Dkt. No. 26-4, Ex. 12. The "robust secondary market for

14  KOOL-branded merchandise and collectibles" consists of a few eBay listings for

15  vintage collectibles. Dkt. No. 26-4, Ex. 15. A few vintage collectibles on eBay and a

16  t-shirt worn by Pete Davidson hardly establish likelihood of showing fame.

17     (c)     *The BLOOM marks do not blur or tarnish the KOOL marks.*

18     It is implausible that Capna's BLOOM house mark will blur the entirely

19  different KOOL Word Marks or the not-at-all-distinctive Interlocking O Marks. The

20  Lanham Act sets forth six factors a court may consider in analyzing whether

21  blurring has occurred: (i) the degree of similarity between the mark or trade  name

22  and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the

23  famous mark; (iii) the extent to which the owner of the famous mark is engaged in

24  substantially exclusive use of the mark; (iv) the degree of recognition of the famous

25  mark; (v) whether the user of the mark or trade name intended to create an

26  association with the famous mark; and (vi) any actual association between the mark

27  or trade name and the famous mark. 15 U.S.C. § 1125(c)(2)(B). The first, second,

28  and fifth factors were all discussed previously: the overall designs of the two

1  companies products are almost entirely dissimilar; the Interlocking Os are a

2  common graphic design element with neither inherent nor acquired distinctiveness;

3  and Capna had no intent to associate its premium cannabis product with KOOL

4  menthol tobacco cigarettes. *See supra* at Sections III.B.1.a-b, e.

5      The other three factors also heavily favor Capna. Plaintiff is not engaged in

6  substantially exclusive use of the mark; rather, interlocking circles are a common

7  design element. It does not matter for the purposes of dilution that Plaintiff is "the

8  only company that uses the interlocking 'OO's … in connection with tobacco or

9  related products" (Dkt. No. 31 at 27), because dilution by blurring concerns the

10 perception of a mark among consumers. *See Mattel*, 296 F.3d at 903-04 (analyzing

11 dilution by blurring). Capna's use of interlocking circles cannot blur the public's

12 association of interlocking circles with KOOL, when the public is already more

13 likely to associate interlocking circles with Mastercard or Audi. Plaintiff has offered

14 no evidence, such as survey data, that would suggest that the public recognizes the

15 Interlocking O Marks, as opposed to the KOOL Word Marks, as designating KOOL

16 cigarettes. And again, as with likelihood of confusion, Plaintiff cannot offer a single

17 piece of evidence that any actual consumer associates BLOOM with KOOL,

18 whether for confusion or blurring purposes. Plaintiff may not need to show actual

19 association to prevail, but it has to show some evidence of dilution by blurring. It

20 has not.

21      Plaintiff's claim to dilution by tarnishment is even more dubious. In addition

22 to the basic facts already discussed showing that no consumer is likely to associate

23 BLOOM's cannabis products with KOOL cigarettes, such an association could not

24 harm the reputation of one of America's most reviled consumer products.

25 Tarnishment, as Plaintiff argues, "occurs when another's use of a mark is associated

26 with unwholesome activity." Dkt. No. 31 at 27 (citing *Deere & Co. v. MTD Prods.,*

27 *Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)). But "[t]here has to be something to tarnish in

28 order to find dilution by tarnishment." *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp.

2d 1277, 1285 (W.D. Wash. 2003). Plaintiff argues that it will suffer a negative association with Capna's "federally illegal, unregulated, and dangerous products," (Dkt. No. 31 at 27), but ignores that cannabis is heavily regulated at the state level, and that its own products are far more dangerous, would already be illegal in California had tobacco industry lobbyists not placed a referendum on the ballot, and will apparently be outlawed federally shortly. *See* Masur Decl., Exs. 6-8.

The BLOOM brand in fact has a reputation for high quality cannabis extracts without toxic additives, as demonstrated by positive reviews in industry publications and at Forbes.com. Mekk Decl. at ¶ 8, Ex. 1. Plaintiff's only evidence that the BLOOM brand has a reputation for poor quality is a single voluntary recall of one batch of product in June 2018. Dkt. No. 31 at 12. This recall was done to maintain BLOOM's reputation for high quality, and no more damaged BLOOM's brand than the many recalls of other consumer products have harmed their brands' respective reputations. Mekk Decl. at ¶ 9. Perhaps in Virginia in 2012, an unregulated synthetic marijuana named NEWPROT tarnished the NEWPORT cigarette brand (*Lorillard Tobacco Co. v. California Imports, LLC*, 886 F. Supp. 2d 529, 537 (E.D. Va. 2012)), but in California in 2021, BLOOM cannabis vapes sold in full compliance with state regulations do not tarnish KOOL cigarettes—both because the marks are too dissimilar for dilution to occur and because the general consuming public has a more positive opinion of cannabis than of menthol cigarettes.

### C.      Plaintiff cannot show irreparable harm.

If Plaintiff could show a likelihood of success on the merits—which it cannot, for the reasons stated above—it would be entitled to a "rebuttable presumption" of irreparable harm. 15 U.S.C. § 1116(a). But even so, the "sliding scale" would require Plaintiff to show a high likelihood of success on the merits. *See Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1134-35 (9th Cir. 2011). Here, that presumption is rebutted by the fact that KOOL has no good reputation left to protect. Plaintiff cites cases where irreparable harm occurred where a plaintiff would

1  "have lost control over its business reputation" (Dkt. No. 31 at 28-29), but Plaintiff's

2  lack of control over its business reputation has culminated, most recently, with

3  articles about the FDA banning its menthol cigarettes in order to "address health

4  disparities experienced by communities of color, low-income populations, and

5  LGBTQ+ individuals, all of whom are far more likely to use these tobacco

6  products." Masur Decl., Exs. 6-7. BLOOM cannabis products—which cannot be

7  broadly advertised, are only available in a few states, and have no obvious

8  connection with KOOL cigarettes—threaten no cognizable harm to Plaintiff.

9  Plaintiff's only purported irreparable harm is loss of reputation, and it has no

10  reputation—and soon, will have no product—to lose. Because Plaintiff will at most

11  a miniscule amount of harm, the Court should deny Plaintiff's motion.

12  **D.     A preliminary injunction is not in the public interest.**

13       Plaintiff argues that an injunction would "protect the public from purchasing

14  and using unregulated products of unknown quality when they intend to purchase

15  legal and regulated tobacco products." This will never happen. If a consumer want

16  to purchase KOOL cigarettes, that consumer will go to a store that sells tobacco, like

17  a convenience store or supermarket, not a cannabis dispensary. And Plaintiff's

18  argument that Capna is a "serial infringer" in need of policing is specious, as using

19  the name of an agricultural strain in a product containing that strain does not

20  infringe a trademark for unrelated goods, and none of the purportedly infringed

21  mark owners have ever complained of Capna's uses. Mekk Decl. at ¶ 10. By

22  contrast, the federal government has made clear that tobacco advertising—especially

23  for menthol cigarettes—is against the public interest. Masur Decl., Exs. 3, 7, 9.

24  **E.     Any preliminary injunction should be narrowly tailored to only**

25  **enjoin the uncolored, isolated interlocking circle mark.**

26       There is no likelihood of confusion or dilution. But were the Court to find any

27  merit to Plaintiff's arguments, it would presumably concern the uncolored, isolated

28  interlocking circle mark. Almost every use of the interlocking circles by Capna

1   colors at least the intersection of the circles red, and most also include the house

2   mark "BLOOM." Dkt. No. 26-4, Ex. 8. In contrast, nearly every example of KOOL

3   packaging provided by Plaintiff is dominated by the colors green or blue, cool colors

4   symbolic of menthol. Dkt. No. 26-4, Ex. 3. The color red and the name BLOOM, as

5   part of Capna's house mark, prevent any residual risk of confusion or dilution that

6   might occur among the few consumers who know that the interlocking circles in

7   isolation are a KOOL trademark, but unsophisticated enough to believe that KOOL

8   has entered the cannabis market without using the word "KOOL." *See, e.g., Ross*,

9   2008 WL 11336378, at *7; *Cohn*, 281 F.3d at 842.

10       This Court has found that in a trademark infringement case, if a preliminary

11   injunction is granted, it should be limited to only the conduct that may cause

12   irreparable harm. *See Generosity.org v. Generosity Beverages, Inc.*, No. 2:17-cv-

13   6054-ODW-KS, 2017 WL 6209819, at *5 (C.D. Cal. Dec. 6, 2017). Here, Capna's

14   continued sales of products containing its BLOOM house mark or containing the

15   interlocking circles with BLOOM's distinctive red intersection will not cause

16   Plaintiff any harm. If—despite the dissimilarity of the companies use of their marks,

17   the complete separation of their product lines, and the weakness of the Interlocking

18   O Marks—the Court still decides to grant a preliminary injunction, the injunction

19   should be far narrower than that requested by Plaintiff, and should allow Capna to

20   continue to sell products and put on its website its full BLOOM house mark (with

21   the interlocking Os in the middle of the word BLOOM) and its red intersection

22   house mark (with the intersection of the interlocking Os colored red). Such narrow

23   tailoring will minimize the cost to Capna of any redesign of existing packaging.

24       Any preliminary injunction should also be limited in two other ways: (1) it

25   should not limit any Capna product sales in licensed cannabis dispensaries (which

26   are currently all of them, *see* Mekk Decl. at ¶ 12), and (2) it should not require

27   Capna to recall products or demand that distributors or retailers stop promoting or

28   selling existing products. No customer of KOOL cigarettes is going to confuse

BLOOM cannabis products in a cannabis dispensary with menthol cigarettes. And if existing Capna sales were going to somehow harm Plaintiff in any way, the additional harm from selling off existing inventory would be minimal and reparable. An order requiring Capna to recall existing products would be extremely expensive and likely would bankrupt Capna, which Plaintiff claims to have no desire to harm. Mekk Decl. at ¶ 15; Dkt. No. 31 at 30 ("ITGB does not and has never objected to Defendant's use of BLOOM per se"). But an order preventing BLOOM from using interlocking circles in isolation, separate from its house mark, on future sales of products that may be sold in the same stores as KOOL cigarettes, would prevent any conceivable harm to Plaintiff while minimizing the damage to Capna. An order requiring Capna to recall and rebrand all its products, as demanded by Plaintiff, would effectively destroy Capna's business, cause millions of dollars of damage in lost sales and liability to Capna's third-party franchisees, and require a bond far higher than the minimal $10,000 bond suggested by Plaintiff. Mekk Decl. at ¶¶ 15-16.

## IV.   <u>CONCLUSION</u>

KOOL cigarette smokers know the difference between mentholated tobacco and cannabis oil; between the words "BLOOM" and "KOOL"; between green or blue cold and red heat; and between cannabis dispensaries and places that sell cigarettes. The single point of similarity between the two companies' packaging is a common design element—interlocking circles—shared with many other more famous brands. For the limited remaining time in which Plaintiff's product is still legally sold, that single point of similarity creates no risk of confusion or dilution, given the obvious differences in name, packaging design, and goods between KOOL cigarettes and BLOOM cannabis vaporizers.

1        Plaintiff has not shown and cannot show any likelihood of success on the

2 merits. Its motion for a preliminary injunction should be denied in its entirety.

3

4 Dated:  May 10, 2021               Respectfully submitted,

5                             **ZUBER LAWLER LLP**

6                             JOSHUA M. MASUR

7               By:    */s/ Joshua M. Masur*

8                             Attorneys for Defendant Capna Intellectual

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28